## BURTON *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 539.    Argued April 3, 4, 1906.—Decided May 21, 1906.

Congress has power to make it an offense against the United States for a Senator or Representative, after his election and during his continuance in office, to agree to receive, or to receive, compensation for services before a Department of the Government, in relation to matters in which the United States is directly or indirectly interested, and § 1782, Rev. Stat., is not repugnant to the Constitution as interfering, nor does it by its necessary operation, interfere with the legitimate authority of the House of Congress over their respective members.

· Including in the sentence of a Senator convicted of an offense under § 1782, Rev. Stat., that he is rendered forever thereafter incapable of holding any office of trust or emolument of office under the Government of the United States is simply a recital of the effect of the conviction, and the conviction does not operate *ipso facto* to vacate his seat or compel the Senate to expel him or to regard him as expelled.

While the Senate, as a branch of the Legislative Department, owes its existence to the Constitution and passes laws that concern the entire country, its members are chosen by state legislatures and cannot properly be said to hold their places under the Government of the United States.

The United States is interested, either directly or indirectly within the meaning of § 1782, Rev. Stat., in protecting its mails and postal facilities from improper and illegal use and in enforcing statutes regulating such use.

Where the indictment clearly discloses all the elements essential to the commission of the offense charged, and the averments are sufficient in

the event of acquittal, to plead the judgment in lieu of a second prosecution for the same offense, the defendant is informed of the nature and cause of the accusation against him within the meaning of the Constitution and according to the rules of pleading;—and in this case the evidence was sufficient to justify the case being sent to the jury and the court below did not err in refusing to direct an acquittal, nor was there any error in the court's charge to the jury.

Under § 1782, Rev. Stat., an agreement to receive compensation, whether received or not for the prohibited services, is made one offense, and the receiving of compensation, whether in pursuance of a previous agreement or not, is made a separate and distinct offense.

The intention of the legislature must govern in the interpretation of a statute. It is the legislature and not the court which is to define a crime and ordain its punishment.

A plea of *autrefois acquit* must be upon a prosecution for the same identical offense, and where defendant on a former trial was acquitted of having received compensation forbidden by § 1782, Rev. Stat., from an individual described as an officer of a certain corporation, and at the same time was found guilty of having received such compensation from the company, he cannot plead the former acquittal as a bar to a further prosecution of the charge that he had received such compensation from the company.

The Federal court at the place where the agreement was made for compensation to perform services forbidden by § 1782, Rev. Stat., has jurisdiction to try the offense, and even if the agreement was negotiated or tentatively accepted at another place, the place of its final acceptance and ratification is where the agreement was made although defendant may not have been at that place at that time.

THE facts are stated in the opinion.

*Mr. John F. Dillon, Mr. Bailey P. Waggener* and *Mr. F. W. Lehmann,* with whom *Mr. Harry Hubbard, Mr. W. H. Rossington, Mr. W. Knox Haynes* and *Mr. W. P. Hackney* were on the briefs, for plaintiff in error:

The United States was not a party to nor interested in the proceedings set forth in the indictment. *Inhabitants* v. *Smith,* 11 Metc. (Mass.) 390; *McGrath* v. *The People,* 100 Illinois, 464; *Evans* v. *Eaton,* 7 Wheat. 356; *State* v. *Sutton,* 74 Vermont, 12; *Foreman* v. *Marianna,* 43 Arkansas, 324; *Taylor* v. *Commissioners,* 88 Illinois, 526; *Railroad Company* v. *Kellog,* 54 Nebraska, 138; *Sauls* v. *Freeman,* 24 Florida, 209; *Bowman's 76; Case,* 67 Missouri, 146; *United States* v. *Wiltberger,* 5 Wheat.

*United States* v. *Sheldon*, 2 Wheat. 119; *United States* v. *Morris*, 14 Pet. 464; *United States* v. *Clayton*, 2 Dill. 218.

The indictment states no facts showing the pendency of any proceeding in the Postal Department. *United States* v. *Hess*, 124 U. S. 483; *Post* v. *United States*, 161 U. S. 583; *Virginia* v. *Paul*, 148 U. S. 107; *American School &c.* v. *McAnulty*, 102 Fed. Rep. 565; *Dauphin* v. *Key*, 11 D. C. App. 203; *Enterprise Savings Assn.* v. *Zumstein*, 64 Fed. Rep. 837; aff'd *S. C.*, 67 Fed. Rep. 1000; *Bates & Guild* v. *Payne*, 194 U. S. 106; *Public Clearing House* v. *Coyne*, 194 U. S. 497; *United States* v. *Ju Toy*, 198 U. S. 253; *United States* v. *Eaton*, 144 U. S. 677; *Caha* v. *United States*, 152 U. S. 211.

There was a former indictment and trial for and acquittal of the offense. Placing the defendant on trial again for the offense alleged was in violation of the Sixth Amendment. *Baldwin* v. *Bank*, 1 Wall. 234; *Mechanics' Bank* v. *Bank*, 5 Wheat. 236; *Ford* v. *Williams*, 21 How. 289; *Navigation Co.* v. *Merchants' Bank*, 6 How. 381; *Commercial Bank* v. *French*, 21 Pick. 486; *Dugan* v. *United States*, 3 Wheat. 172. Cases in 2 Daniel on Negotiable Instr., 1st ed., §§ 1187–1189. *State* v. *Cooper*, 13 N. J. Law, 361; *Hurst* v. *State*, 86 Alabama, 604; Cooley, Const. Lim., 7th ed., 470; *People* v. *McGowan*, 17 Wend. 386; *Monroe* v. *State*, 111 Alabama, 15; *United States* v. *Lee*, 4 Cranch C. C. 446; *Ball* v. *United States*, 163 U. S. 662; *United States* v. *Nickerson*, 17 How. 204; *Mitchell* v. *State*, 42 Ohio St. 384; *Campbell* v. *State*, 9 Yerger, 333; *State* v. *Martin*, 30 Wisconsin, 216; *Stuart* v. *Comm.*, 28 Gratt. 950; *Gunther* v. *People*, 24 N. Y. 100; *Morris* v. *State*, 8 S. & M. 762; *State* v. *Kattleman*, 35 Missouri, 105; *State* v. *Kibble*, 2 Tyler, 471; *Dealy* v. *United States*, 152 U. S. 539.

There was no evidence to go to the jury that Burton made any agreement to receive compensation for services to prevent the issuance of a fraud order. Whatever agreement was made to receive compensation from the Rialto Grain and Securities Company for services, such agreement was not made in the State of Missouri, and the defendant was deprived of his con-

stitutional right to be tried in the State and District where the agreement was made, contrary to § 2, art. III, of the Constitution and of the Sixth Amendment thereof. *Tayloe* v. *Merchants' Ins. Co.*, 9 How. 390; *Patrick* v. *Bowman*, 149 U. S. 411; 12 Ency. Law and Prac. 239, 240; *Burr's Case*, Marshall's Const. Dec. 82, 165; *Palliser* v. *United States*, 136 U. S. 256; *Horner* v. *United States*, 143 U. S. 212; *Sands* v. *State*, 26 Tex. App. 580; *United States* v. *Fowkes*, 53 Fed. Rep. 13; *United States* v. *Dietrich*, 126 Fed. Rep. 664; *Eliason* v. *Henshaw*, 4 Wheat. 225; *National Bank* v. *Hall*, 101 U. S. 43; *Railway Co.* v. *Rolling Mills*, 119 U. S. 151; Chitty on Contracts, 11 Am. ed., p. 15, note *f; Christian Co.* v. *Bienville Co.*, 106 Alabama, 124; *Tennessee Co.* v. *Pierce*, 81 Fed. Rep. 814; *Seitz* v. *Brewers' &c. Co.*, 141 U. S. 510.

The agreement of the defendant with the Rialto Company was for service by the month, and no service in the Department having been rendered during the period covered by the payment made March 26, there was no offense in the receipt of that payment. *Davis* v. *Preston*, 6 Alabama, 83; *Matthews* v. *Jenkins*, 80 Virginia, 463; *La Coursier* v. *Russell*, 82 Wisconsin, 265; *Benedict* v. *United States*, 176 U. S. 357; *In re Hans Nielsen*, 131 U. S. 188.

The defendant was not subject to trial and punishment as for separate offenses in agreeing to receive and receiving compensation for the services charged in the indictment to have been rendered by him. 2 Bishop's New Criminal Procedure, § 55; 1 Bishop's New Criminal Procedure, § 436; *State* v. *Jones*, 106 Missouri, 802.

The juror William V. Jones was disqualified because he had formed and still retained an opinion as to the guilt or innocence of the defendant, an opinion which was the result of reading the reports of the former trial, which reports he believed to be true, and the challenge to him should have been sustained. *Lewis* v. *United States*, 146 U. S. 370; *Williams* v. *United States*, 93 Fed. Rep. 396.

The letters of Houts, Evans, Allen, Warner and Fravel,

and the accompanying circulars and booklets, all of which were read in full, to the jury, were incompetent and irrelevant as against the defendant, as he had no knowledge of them whatever, and their contents were not necessary to show the fact that some matter was pending in the Department against the Rialto Grain and Securities Company. *Tappan* v. *Beardsley,* 10 Wall. 427.

The endorsements on the jacket subsequent to March 26, 1903, the report of Inspectors Price and Piatt of August 20, 1903, and the letter of Assistant Attorney General Robb of September 9, 1903, were competent and material evidence for defendant to disprove the charges of the indictment that he had agreed to induce and had in fact induced the Postmaster General to issue no fraud order against the company and to stop investigation of it, and also to show that the investigation being made by the Department was with reference to the indictment and prosecution of the officers of the Rialto Company.

The evidence of Francis C. Hubner should have been stricken out, as it established nothing and permitted the jury to conjecture that there had been an interview between the defendant and the Assistant Attorney General for the Post Office Department relative to the affairs of the Rialto Company.

The instruction of the court as to what would constitute service by the defendant in the Department is not responsive to the charge of the indictment, and authorizes a conviction on account of matters not alleged in the indictment, and said charge is erroneous in other respects. The court also erred in refusing to give instructions asked by defendant. *Flachskamm* v. *United States,* 127 Fed. Rep. 674.

The court at St. Louis had no jurisdiction to try counts three and seven, nor is such jurisdiction conferred by § 731, Rev. Stat. The District of Columbia is not a "judicial circuit" or "judicial district" within the meaning of § 731.

The act of 1864, Rev. Stat. § 1782, under which the indictment was found, is unconstitutional. It is in conflict with the fundamental idea on which our whole Federal Govern-

ment is founded, viz: that the Federal Government is a government of limited powers, with duties defined and restrictions imposed, and no authority is lodged anywhere to change those duties or restrictions, except the power reserved by the people.

.The framers of our Government, in order to prevent the concentration of power into the hands of one man or one body of men, created three departments,—not necessarily to work in harmony together, but each to act wholly independent of the other. It was the intention, as shown by the debates in the constitutional convention and the Constitution itself, to establish an impassable gulf separating these three great departments of the Federal Government. One department shall not encroach upon or in any way coerce the other. To that end there should be no blending of governmental functions, except where it was absolutely necessary, and then the Constitution clearly and zealously guarded the independence of each department, thus emphasizing the basic principle that the great powers of government were so eternally separated each from the other that there could be no conflict between them. The legislature should make, the judiciary interpret, and the executive should administer, the laws.

The President, the members of Congress, and the judges of the Supreme Court are the only officers of the Federal Constitution. All other officers of those several departments are creatures of the legislature, or what this court has styled congressional officers, as distinguished from constitutional officers. The office of the legislative official may be enlarged, modified or abolished by Congress. This is not true of a constitutional office. It is permanent, fixed, and above and beyond the control of Congress. It is also above and beyond the power of the Executive or Judicial Departments. It gets its life from and can only be changed by the Constitution.

Every citizen, be he official or in private station, is alike amenable to the law, but the constitutional official, acting as an official, cannot be called to an account, or punished for any official act, except in the mode as defined and prescribed

in the Constitution creating him. The recognition of this principle is absolutely necessary to protect him in his independence as an official, and to protect the great constitutional bodies in their independence.

The Constitution defines how the President, a member of this court, and a member of Congress can be punished for any official misconduct, and by such constitutional provisions limits the manner of punishment; and Congress has no power to add to or take from the express provisions so made for that purpose. The denial of this proposition would place it in the power of Congress to destroy the independence of each Department, and nullify the Constitution, and that is just the effect of the law under which this prosecution is brought.

A member of Congress may be punished in such manner as each House may determine as to its "own members," and the right to expel extends to all cases where the offense is such as, in the judgment of "each House," is inconsistent with the trust and duty of "its own members."

It would be an anomaly in a constitutional government, with three coördinate branches of such government, as created by the Federal Constitution, if the legislative branch, under whatever pretext, could enact a law making any act of the President, or any act of a Justice of the Supreme Court, a misdemeanor, and delegate the jurisdiction and power to an inferior judicial tribunal to try the President, or a Justice of this court, for a violation of such law, and subject him to fine, imprisonment and removal from office as the result of a verdict of a jury. The mere statement of the proposition would seem to be sufficient to condemn it as absurd, and the shield of the Constitution is no greater protection for the President, —for the Justice of the Supreme Court,—than for the Senator,—each and all of whom are created by the Constitution.

The Government of the United States is one of *enumerated* powers,—The national constitution being the instrument which specifies them,—and in which authority should be found

for the exercise of any power which the National Government assumes to possess. Cooley, Const. Lim., 7th ed., 11; *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 343; *Ableman* v. *Booth,* 21 How. 519.

By the Constitution, there has been delegated express power to each House to punish its own members, in such manner as, in its wisdom, is just and proper, and, by "the concurrence of two-thirds, may expel a member." When the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases. Cooley, Const. Lim., 7th ed., 99; *Lowe* v. *Commonwealth,* 3 Met. (Ky.) 241; *Falloon* v. *Clark,* 61 Kansas, 127; *Brown* v. *Grover,* 6 Bush. (Ky.) 3; *Thomas* v. *Owens,* 4 Maryland, 190; *Commonwealth,* v. *Williams,* 79 Kentucky, 42; *Sheehan* v. *Scott,* 145 California, 684. See also *Morris* v. *Powell,* 125 Indiana, 287; *McAfferty* v. *Guyer,* 58 Pa. St. 109.

The act of 1864 superadds disqualifications to those expressly contained in the Constitution, and prescribes a mode of procedure and a punishment not expressly authorized by the Constitution, or conferred by necessary implication. Indeed, the express power conferred is an implied prohibition against the exercise by Congress of that most extraordinary legislation,—the basis of this prosecution.

No legislation is appropriate which should conflict with the implied prohibitions upon Congress. They are as obligatory as the express prohibitions. *Ex parte Virginia,* 100 U. S. 361.

When Senator Burton was chosen Senator of the United States, he was chosen for six years. He had all of the qualifications prescribed by the Federal Constitution. He was only required to consult the organic laws as to his duties and obligations as a Senator. He had the constitutional right to hold the office for six years, subject only to the delegated, enumerated and express power of the Senate to expel him, and subject to

the disqualifications provided in section 6, article II, of the Constitution.

The act of 1864 applies only to the conduct or. action of the Senator, as contradistinguished from the conduct or action of the citizen. It is a limitation and restriction upon the conduct and action of the Senator during his term of office, nowhere in the Constitution, expressly or by necessary implication, conferred upon Congress to create. The Senate, by and through the power delegated to it by the Constitution, might properly expel for doing of the things charged in the indictment, as a violation of senatorial dignity, but Congress had no power, by enactment, to make such acts and conduct of the Senator a crime, and delegate to the Judiciary the power to take from the Senator the rights and privileges guaranteed by the Constitution. The judgment of conviction not only imprisons him, but disqualifies him from holding the office for which he was chosen by the State of Kansas, for "six years." *United States* v. *Harris,* 106 U. S. 636; 1 Story on Const. § 833; 1 Kent's Com. 235; *People* v. *Hall,* 80 N. Y. 121.

The act of 1864, and section 5, article I, of the Constitution, are wholly incompatible, and in irreconcilable conflict. It cannot be that the framers of the Constitution intended, by express grant, to confer upon each House· the power to be the sole judge of the qualification of its own members, and, by implication, to confer the power upon both House and Senate, by concurrent action, by statute, to disable and disqualify each House from exercising the powers thus expressly conferred.

In all of the debates in the constitutional convention, such a contingency was not considered. Evidently, by the express grant conferred by the Constitution, the intention was to lodge the power in each House, to the exclusion of the other.

The identical question was decided by Mr. Justice Brewer, when on the supreme bench of Kansas, in the case of *State* v. *Gilmore,* 20 Kansas, 554, in which was under consideration

a section of the constitution of the State of Kansas, exactly similar to the first clause of section 5, article I, Constitution of the United States. See also *State v. Tomlinson*, 20 Kansas, 703; *Robertson* v. *State*, 109 Indiana, 92; *State* v. *Baxter*, 28 Arkansas, 129.

It is well settled that section 5, article I, providing that "Each House shall be the judge of the elections, returns and qualifications of its own members," confers upon "each House" powers of a judicial nature,—in the exercise of which its decision is conclusive, and not subject to review by the courts. *People* v. *Mahoney*, 13 Michigan, 482; *Dalton* v. *State*, 43 Ohio St. 680. Wherever the Constitution has prescribed the qualifications of electors, they cannot be changed or added to by the Legislature, or otherwise than by an amendment of the Constitution. Cooley, Const. Law, 5th ed., 753; *Allison* v. *Blake*, 57 N. J. L. 8, 11; *Kimball* v. *Hendee*, 57 N. J. L. 207.

The act of 1864 uses the words "under the Government of the United States." The Senate is a part of the Government of the United States. Section 1, article I, of the Constitution; section 3, article I.

The office of Senator is one of "profit," under the Government of the United States. Section 6, article I, Constitution.

A State cannot superadd qualifications of a Senator to those prescribed by the Constitution of the United States. *In re Trumbull*, Taft Elec. Cases, 148.

If the Senator is a state officer, and the act of 1864 is constitutional, then Congress would have the power to make the same applicable to the Governor of each sovereign State and this cannot be done. *Kentucky* v. *Dennison*, 24 How. 107.

If, therefore, a Senator is not an officer of the United States in the sense of the Constitution, clearly he may not be coerced, or punished for his refusal to obey the requirements of an act of Congress relative to the discharge of his duties as United States Senator. *United States* v. *Germain*, 99 U. S. 510;

*United States* v. *Mouat,* 124 U. S. 307; *United States* v. *Smith,* 124 U. S. 532; *In re Greene,* 134 U. S. 377; *McPherson* v. *Blacker,* 146 U. S. 35, 36.

The power of "each House" to judge of the qualifications of its own members, and to establish rules for its proceedings,—to punish members, and, "with the concurrence of two-thirds," expel a member, is not strictly speaking a legislative, but a judicial function, and, unless the act of 1864 can be said to be "necessary and proper for carrying into execution" these functions, it is manifestly unconstitutional. Mr. Madison, The Federalist, vol. 1, p. 273, No. 48; *Marbury* v. *Madison,* 1 Cranch, 391; 1 Tucker on Constitution, 368.

The nature of the implied power exercised as a means must be legitimate; in other words, no power will be implied as a means to an end which is not legitimate; that is, not within the powers granted by the Constitution. The ancillary legislation must be a necessary and proper means to accomplish an end which is clearly constitutional. See *Anderson* v. *Duan,* 6 Wheat. 233.

The express power conferred excludes the idea of any implied power not necessary and proper for carrying into execution the express power.

There is still another view of the act of 1864 which would seem to be an unanswerable reason to sustain the contention that it is unconstitutional. It did not require the concurrence of two-thirds of either or both Houses to pass it. It might become a law with the consent of a bare majority of each House. While the act does not in terms provide for forfeiture of office, or expulsion, it requires a judgment, upon conviction, that the person convicted shall be "rendered forever thereafter incapable of holding any office of honor, profit or trust under the government of the United States." The effect of the judgment, if the act is valid, is to expel the Senator from the Senate. *Lowe* v. *Commonwealth,* 3 Metc. (Ky.) 241; 1 Tucker on Constitution, 429.

By the act of 1864 Congress accomplishes a result which

the Senate may only do "with the concurrence of two-thirds;" and by an act which is not consistent with the letter and spirit of the Constitution. See also Von Holst, Constitutional Law, 102.

The act of 1864 defines a political offense. It is not an attempt to control the conduct of the citizen, but that of the Senator. See Story on Constitution, § 797.

*Mr. Charles H. Robb,* Assistant Attorney General, for the United States:

The plea in bar was not well taken. Count three of the former indictment charged receipt from Mahaney, whereas counts three and seven of the present indictment charged receipt from the corporation. But the effect of granting a new trial at the defendant's instance was to nullify entirely the proceedings at the former trial, including the verdict of acquittal on the third count. *Trono* v. *United States,* 199 U. S. 521.

No error was committed in limiting the number of peremptory challenges to three ; under § 819, Rev. Stat. Congress, having power to do so, denominated the offenses defined by § 1782, R. S., misdemeanors. *Bannon* v. *United States,* 156 U. S. 454; *Reagan* v. *United States,* 157 U. S. 301; *Considine* v. *United States,* 112 Fed. Rep. 342; *S. C.,* 184 U. S. 699; *Jewett* v. *United States,* 100 Fed. Rep. 832; *Tyler* v. *United States,* 106 Fed. Rep. 137, 138; *United States* v. *Coffersmith,* 4 Fed. Rep. 198; *United States* v. *Daubner,* 17 Fed. Rep. 794.

It not appearing that defendant exhausted his three challenges, he cannot therefore complain. *Insurance Company* v. *Hillman,* 188 U. S. 208, 211; *State* v. *Fournier,* 68 Vermont, 262, 266; *Allen* v. *Waddill,* 26 S. W. Rep. 273; *United States* v. *Marchand,* 12 Wheat. 480; *Hayes* v. *Missouri,* 120 U. S. 68, 71.

There was sufficient evidence to go to the jury, the present record containing additional evidence to that presented on the former trial. The court is not concerned with its conclusiveness.

The unlawful agreement was made at St. Louis, where Bur-

ton's offer was accepted. *Taylor* v. *Ins. Co.*, 9 How. 390; *Patrick* v. *Bowman*, 149 U. S. 424; *Garretson* v. *North Atchison Bank*, 47 Fed. Rep. 867; *Phenix Ins. Co.* v. *Schultz*, 80 Fed. Rep. 343; Hammond on Contracts, § 42, n. 22.

No error was committed in the admission or exclusion of evidence.

The charge of the court set the entire case, as presented by the evidence, fairly and substantially before the jury. This was sufficient. *Railway Co.* v. *Whitton*, 13 Wall. 270, 290; *Tweed's Case*, 16 Wall. 516.

The agreement to receive, and the receipt of compensation constituted two offenses. *Clure* v. *United States*, 159 U. S. 590, 595; *United States* v. *Rendskopf*, 6 Biss. 259; Fed. Cas. 16, 165.

Section 1782, Rev. Stat., does not interfere with the constitutional rights of the Senate or of the individual Senator. It prescribes no new qualifications for a Senator, nor does it interfere with the constitutional control of the Senate over him. It merely makes it unlawful for a Senator to do that which he has no moral nor constitutional right to do.

Senators have no constitutional right to appear for hire and against the interests of the Government before any Executive Department or bureau in any matter in which the United States is interested. In fact, that is plainly inconsistent with their Senatorial duties and obligations. With the performance of their constitutional duties as Senators no act of Congress could properly interfere. But when they forsake those duties and engage in matters plainly in conflict with their official obligations they must be amenable to law like other servants of the Government.

The Constitution itself recognizes this amenability of Senators and Representatives. They are privileged from arrest during their attendance at the session of their respective Houses in all cases "except treason, felony, and breach of the peace." Art. I, sec. 6. These words, Mr. Justice Story said, are the same as those in which the privilege of members of the

English Parliament was expressed, and, as all crimes are offenses against the peace, the phrase "breach of the peace" should be construed in accordance with the parliamentary rule to extend to all indictable offenses. 1 Story on Const. § 865.

The provision of section 5 article II which authorizes each House to compel the attendance of absent members must be construed in the light of the above provision, which recognizes that members may be arrested for crime and the Senate thereby deprived of their attendance.

Plaintiff in error concedes that a Senator is not above the law—the criminal statutory law—but says that "Congress has no constitutional power, by legislation, to place any limitations or restrictions upon his official conduct as a Senator."

Section 1782 places no restriction upon the "official conduct" of a Senator. Section 1782 applies to individuals. It is aimed at all persons holding positions of trust or confidence in the service of the United States. The fact that it specifically refers to a Senator cannot invalidate it. A general law against bribery or other crime would, counsel admit, include a Senator. Would the enumeration of Senators among those included in such a law invalidate it?

The provision of section 1782 that every person offending against the statute "shall, moreover, by conviction therefor, be rendered forever thereafter incapable of holding any office of honor, trust, or profit under the Government of the United States," is not open to constitutional objection. It does not interfere with the authority of the Senate over its members, because the position of Senator cannot be construed to be an office under the Government of the United States within the meaning of that section. Story on Const. § 793.

The decisions of this court hold that those only are officers of the United States in a constitutional sense and in the sense in which those words are employed in the statutes, who hold their places by virtue of an appointment by the President or a court of law or the head of a Department. *United States* v.

*Germaine,* 99 U. S. 508; *United States* v. *Mouat,* 124 U. S. 307; *United States* v. *Smith,* 124 U. S. 532.

There is no distinction between "officers of the United States" and the language of the statute "office under the Government of the United States."

If Congress had intended that the effect of conviction of violating section 1782 should be to unseat a Senator or Representative, it would have said so. Certainly the court will not twist the words used from their usual sense so as to render the statute unconstitutional. Properly read, the statute leaves the status of a convicted Senator as a member of the Senate to the determination of that body. They may or may not expel him, as they see fit. In this respect section 1782 is no different from any other statute. It was surplusage for the court to include this declaration of the statute in its sentence. The disqualification referred to attaches by virtue of the law itself upon conviction.

If the sentence is defective in any respect, opportunity should be given to correct it. *In re Bonner,* 151 U. S. 242.

MR. JUSTICE HARLAN delivered the opinion of the court.

This criminal prosecution is founded upon the following sections of the Revised Statutes:

"SEC. 3929. The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, instruct postmasters at any post office at which registered letters arrive directed to any such person or company, whether such agent or representative is acting as an individual or as a firm, bank, corporation, or association of any kind, to return all such

registered letters to the postmaster at the office at which they were originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside thereof; and all such letters so returned to such postmasters shall be by them returned to the writers thereof, under such regulations as the Postmaster General may prescribe. . . ." By the act of March 2, 1895, c. 191, this section was "extended and made applicable to all letters or other matter sent by mail." 26 Stat. 465; 28 Stat. 963, 964.

"SEC. 4041. The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, forbid the payment by any postmaster to said person or company of any postal money orders drawn to his or its order, or in his or its favor, or to the agent of any such person or company, whether such agent is acting as an individual or as a firm, bank, corporation, or association of any kind, and may provide by regulation for the return to the remitters of the sums named in such money orders. . . ." 26 Stat. 465, 466, c. 908.

"SEC. 1782. No Senator, Representative or Delegate, after his election and during his continuance in office, and no head of a Department, or other officer or clerk in the employ of the Government, shall receive or agree to receive any compensation whatever, directly or indirectly, for any services rendered, or to be rendered, to any person, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or other matter or thing in which the United States is a party, or directly or indirectly interested, before any Department, court martial, bureau, officer, or any civil, military, or naval commission whatever. Every person offending against this section shall be deemed guilty of a mis-

demeanor, and shall be imprisoned not more than two years, and fined not more than ten thousand dollars, and shall, moreover, by conviction therefor, be rendered forever thereafter incapable of holding any office of honor, trust, or profit under the Government of the United States." 13 Stat. 123, c. 119.

The plaintiff in error was indicted in the Circuit Court of the United States for the Eastern District of Missouri for a violation of section 1782, the offense being alleged to have been committed at St. Louis. The accused was found guilty, and on writ of error the judgment was reversed by this court and a new trial ordered, upon the ground, among others, that according to the facts disclosed in that case the offense charged was not committed in the State of Missouri where the accused was tried. *Burton* v. *United States*, 196 U. S. 283.

Subsequently, the defendant was tried under a new indictment (the present one) charging him with certain violations of section 1782. The indictment contained eight counts. Stating the case now only in a general way, the first, second, fourth, sixth and eighth counts charged, in substance, that the defendant, a Senator of the United States, had *agreed* to receive compensation, namely, the sum of $2,500, for services to be rendered by him for the Rialto Grain and Securities Company, a corporation (to be hereafter called the Rialto Company), in relation to a proceeding, matter and thing, in which the United States was interested, before the Post Office Department, those counts differing only as to the nature of the interest, which the United States had in such proceeding, matter and thing; some of the counts alleging that the United States was directly, others that it was indirectly, interested in such proceeding, matter and thing. The third, fifth and seventh counts charged that the defendant did *receive* compensation to the amount of $500 for the services alleged to have been so rendered by him, those three counts differing only as to the nature of the interest, whether direct or indirect, which the United States had in the alleged proceeding, matter and thing before the Post Office Department.

The defendant demurred to each count. The Government, at that stage of the prosecution, dismissed the indictment as to the fourth and fifth counts and the court overruled the demurrer as to all the other counts. The accused filed a plea in bar to the third and seventh counts. To that plea the Government filed an answer, to which we will advert hereafter. A demurrer to that answer was overruled and, defendant declining to plead further, the plea in bar was denied. He was then arraigned, tried and found guilty on the first, second, third, sixth, seventh and eighth counts. No judgment or sentence was pronounced on the first, second and eighth counts, because they covered the transaction and offense mentioned in the sixth count. And as the third count covered the transaction and offense embraced by the seventh count, no judgment or sentence was pronounced on it.

On the sixth count the defendant was sentenced to be imprisoned for six months in the county jail and to pay a fine of $2,000; on the seventh, to be imprisoned for six months in the county jail and fined $500. It was declared or recited in the judgment on each of those counts that the accused, by his conviction, "is rendered forever hereafter incapable of holding any office of honor, trust or profit under the Government of the United States."

It will be well to bring out fully the allegations of the two counts upon which the sentences were based. They will show the nature of the proceeding, matter or thing before the Post Office Department, in respect of which the defendant was indicted.

The sixth count alleged that on the eighteenth day of November, 1902, the defendant was a Senator of the United States from the State of Kansas, having been theretofore elected for a term of six years expiring on the fourth day of March, 1907, and the Rialto Company was a corporation engaged in the business of buying, selling and dealing in grain and securities, having its principal offices at the city of St. Louis, Missouri; that before and on the above day there was pending before

the Post Office Department of the United States and before the then Postmaster General of the said United States a certain proceeding in which the United States was then indirectly interested, for determining the question whether that corporation was engaged in conducting a scheme for obtaining money through the mails of the said United States, by means of false and fraudulent pretenses, representations, and promises, made by the said corporation, and whether the said Postmaster General should instruct the postmaster at the post office at St. Louis, the same then being a post office at which registered letters were then arriving, directed to the said corporation, to return all such letters to the postmasters at the several post offices at which they were or should thereafter be originally mailed, with the word "fraudulent" plainly written or stamped upon the outside thereof, to be by such postmasters returned to the writers thereof under the regulations of the said Post Office Department, and in the same manner to dispose of all other letters and matter sent by mail to the said post office directed to the said corporation, "all of which the said Postmaster General might then have lawfully done, upon evidence satisfactory to him that the said corporation was engaged in conducting such a scheme to defraud as that in this count mentioned; and, further, that before and on the day in this count first aforesaid the facts pertaining to the questions in this count mentioned were under investigation by the said Post Office Department and the said Postmaster General and on that day were still undetermined by the said Postmaster General. And the grand jurors aforesaid, upon their oath aforesaid, do further present, that the said Joseph Ralph Burton, Senator, as in this count of this indictment aforesaid, on the said eighteenth day of November, in the year of our Lord nineteen hundred and two, after his said election as such Senator, and during his continuance in office as such Senator, at St. Louis, aforesaid, in the Division and District aforesaid, then well knowing the proceedings in this count mentioned, in which the United States was then indirectly interested, to be,

as it then still was, pending as last aforesaid, before the said
Post Office Department and the said Postmaster General and
undetermined by the said Postmaster General, and then well
knowing the character of that proceeding, and that the said
United States was then indirectly interested in the same
proceeding as last aforesaid, and then well knowing all the
premises in this count set forth, unlawfully did *agree* with the
said Rialto Grain and Securities Company, corporation as
aforesaid, by and through its officers, agents and attorneys,
to receive directly from that corporation through its officers,
agents and attorneys, certain other compensation, to wit, the
sum of twenty-five hundred dollars lawful money of the said
United States, for certain services to be rendered by him,
the said Joseph Ralph Burton, to the said corporation, in rela-
tion to the last-mentioned proceeding in which the said United
States was then indirectly interested as aforesaid, before the
said Post Office Department and before the said Postmaster
General, while the same proceeding was and should still be
pending before the said Post Office Department and the said
Postmaster General and still undetermined by the said Post-
master General, and after his the said Joseph Ralph Burton's
said election as such Senator, and during his continuance in
office as such Senator—that is to say, services consisting of
his the said Joseph Ralph Burton's appearing before the
said Post Office Department and before the said Postmaster
General, the Chief Post Office Inspector, and the Assistant
Attorney General for said Post Office Department, and
other officers of said Post Office Department, as an agent
of and attorney for the said corporation, and obtaining in-
formation for said corporation concerning said proceeding in
this count mentioned, in which the United States was then
indirectly interested, and by the influence of his presence and
of his office as such Senator, and by statements, representa-
tions and persuasion, inducing the said Postmaster General
to believe that the said corporation was not conducting any
such scheme to defraud as that last above mentioned, and to

put a stop to any further investigation of the questions in this count mentioned by the said Post Office Department and by the said Postmaster General, and to refrain from determining the same adversely to the interests of the said corporation, and from instructing the said postmaster at the said post office at St. Louis aforesaid to return the registered letters, and other letters and matter sent by mail aforesaid to the postmasters at the post offices at which they were or should thereafter be originally mailed as aforesaid, with the word 'Fraudulent' plainly written or stamped upon the outside thereof, as aforesaid, to be by such postmasters returned to the writers thereof as aforesaid, and also from forbidding the payment to the said corporation, by the said postmaster at the post office at St. Louis aforesaid, or postal money orders drawn to its order, or in its favor. And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Joseph Ralph Burton, at the time and place, and in manner and form in this count of this indictment aforesaid, unlawfully did offend against section seventeen hundred and eighty-two of the Revised Statutes of the said United States, against the peace and dignity of the said United States."

The seventh count alleged "that on the said twenty-sixth day of March, in the year of our Lord nineteen hundred and three, the said Joseph Ralph Burton, then still being a Senator of the said United States for the said State of Kansas, as in the sixth count of this indictment set forth, and having, after his election as such Senator and during his continuance in office, to wit, on divers days between the said eighteenth day of November, in the year of our Lord nineteen hundred and two, and the said twenty-sixth day of March, in the year of our Lord nineteen hundred and three, rendered the services in the said sixth count described, to the corporation in that count mentioned, before the Postmaster General of the said United States and before the said Post Office Department, and the same having been, as he the said Joseph Ralph Burton, when so rendering the same, well knew, services in relation to the

proceeding described in the said sixth count, in which the said United States was indirectly interested, pending, as he the said Joseph Ralph Burton also well knew, before the said Post Office Department and Postmaster General, unlawfully did, after his said election and during his continuance in office, at St. Louis aforesaid, in the said Eastern Division of the said Eastern District of Missouri, receive directly from the said corporation through its officers, agents and attorneys, certain compensation for the same services, that is to say, five hundred dollars; he the said Joseph Ralph Burton, when so receiving such compensation for the said services, well knowing the same to have been services in relation to a proceeding pending before a Department and before an officer of the Government of the said United States, and well knowing the said proceeding to have been a proceeding in which the said United States was indirectly interested, and one pending before the said Post Office Department and Postmaster General, and undetermined by the said Postmaster General, as in the said sixth count is more fully set forth: against the peace and dignity of the said United States, and contrary to the form of the statute of the same in such case made and provided."

Motions for new trial and in arrest of judgment having been denied, the case was brought here upon writ of error.

1. The first question to be considered is whether section 1782 is repugnant to the Constitution of the United States. This question has been the subject of extended discussion by counsel. But we cannot doubt the authority of Congress by legislation to make it an offense against the United States for a Senator, after his election and during his continuance in office, to agree to receive or to receive compensation for services to be rendered or rendered to any person, before a Department of the Government, in relation to a proceeding, matter or thing in which the United States is a party or directly or indirectly interested.

The principle that underlies section 1782 is not wholly new in our legislative history. For instance, by the act of March 3,

1863, 12 Stat. 765, c. 92, Rev. Stat. § 1058, it was declared that members of Congress shall not practice in the Court of Claims. Later, Congress by statute declared that no member of or Delegate to Congress shall directly or indirectly, himself or by any other person in trust for him, or for his use or benefit, or on his account, undertake, execute, hold, or enjoy, in whole or in part, any contract or agreement made or entered into in behalf of the United States, by any officer or person authorized to make contracts on behalf of the United States; and every person violating this section was to be deemed guilty ·of a misdemeanor, and fined three thousand dollars. Rev. Stat. § 3739.

Counsel for the accused insists that section 1782 is in conflict with the fundamental idea of the Federal system, namely, that the Government is one "of limited powers, with duties and restrictions imposed, and no authority is lodged anywhere to change those duties or restrictions, except the power reserved by the people." The proposition here stated is certainly not to be disputed; for it is settled doctrine, as declared by Chief Justice Marshall, and often repeated by this court, that "the Government of the United States can claim no powers which are not granted to it by the Constitution, and the powers actually granted must be such as are expressly given or given by necessary implication." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 343. We do not, however, perceive that there has been in the statute before us any departure from that salutary doctrine.

It is said that the statute interferes, or, by its necessary operation, will interfere, with the legitimate authority of the Senate over its members, in that a judgment of conviction under it may exclude a Senator from the Senate before his constitutional term expires; whereas, under the Constitution, a Senator is elected to serve a specified number of years, and the Senate is made by that instrument the sole judge of the qualifications of its members, and, with the concurrence of two-thirds, may expel a Senator from that body. In our judgment

there is no necessary connection between the conviction of a
Senator of a public offense prescribed by statute and the au-
thority of the Senate in the particulars named. While the
framers of the Constitution intended that each Department
should keep within its appointed sphere of public action, it was
never contemplated that the authority of the Senate to admit
to a seat in its body one who had been duly elected as a Senator,
or its power to expel him after being admitted, should, in any
degree, limit or restrict the authority of Congress to enact such
statutes, not forbidden by the Constitution, as the public in-
terests required for carrying into effect the powers granted to
it. In order to promote the efficiency of the public service and
enforce integrity in the conduct of such public affairs as are
committed to the several Departments, Congress, having a
choice of means, may prescribe such regulations to those ends
as its wisdom may suggest, if they be not forbidden by the
fundamental law. It possesses the entire legislative authority
of the United States. By the provision in the Constitution
that "all legislative powers herein granted shall be vested in a
Congress of the United States," it is meant that Congress—
keeping within the limits of its powers and observing the re-
strictions imposed by the Constitution—may, in its discretion,
enact any statute appropriate to accomplish the objects for
which the National Government was established. A statute
like the one before us has direct relation to those objects, and
can be executed without in any degree impinging upon the
rightful authority of the Senate over its members or interfer-
ing with the discharge of the legitimate duties of a Senator.
The proper discharge of those duties does not require a Senator
to appear before an executive Department in order to enforce
his particular views, or the views of others, in respect of mat-
ters committed to that Department for determination. He
may often do so without impropriety, and, so far as existing
law is concerned, may do so whenever he chooses, provided he
neither agrees to receive nor receives compensation for such
services. Congress, when passing this statute, knew, as indeed

everybody may know, that executive officers are apt, and not
unnaturally, to attach great, sometimes, perhaps, undue, weight
to the wishes of Senators and Representatives. Evidently the
statute has for its main object to secure the integrity of exec-
utive action against undue influence upon the part of members
of that branch of the Government whose favor may have much
to do with the appointment to, or retention in, public position
of those whose official action it is sought to control or direct.
The evils attending such a situation are apparent and are in-
creased when those seeking to influence executive officers are
spurred to action by hopes of pecuniary reward. There can be
no reason why the Government may not, by legislation, protect
each Department against such evils, indeed, against every-
thing, from whatever source it proceeds, that tends or may tend
to corruption or inefficiency in the management of public af-
fairs. A Senator cannot claim immunity from legislation di-
rected to that end, simply because he is a member of a body
which does not owe its existence to Congress, and with whose
constitutional functions there can be no interference. If that
which is enacted in the form of a statute is within the general
sphere of legitimate legislative, as distinguished from executive
and judicial, action, and not forbidden by the Constitution, it
is the supreme law of the land—supreme over all in public sta-
tions as well as over all the people. "No man in this country,"
this court has said, "is so high that he is above the law. No
officer of the law may set that law at defiance with impunity.
All the officers of the Government, from the highest to the low-
est, are creatures of the law, and are bound to obey it." *United
States* v. *Lee*, 106 U. S. 196, 220. Nothing in the relations ex-
isting between a Senator, Representative or Delegate in Con-
gress and the public matters with which, under the Constitu-
tion, they are respectively connected from time to time,
can exempt them from the rule of conduct prescribed
by section 1782. The enforcement of that rule will not
impair or disturb those relations or cripple the power of
Senators, Representatives or Delegates to meet all rightful

or appropriate demands made upon them as public servants.

Allusion has been made to that part of the judgment declaring that the accused, by his conviction, "is rendered forever hereafter incapable of holding any office of honor, trust or profit under the Government of the United States." That judgment, it is argued, is inconsistent with the constitutional right of a Senator to hold his place for the full term for which he was elected, and operates of its own force to exclude a convicted Senator from the Senate, although that body alone has the power to expel its members. We answer that the above words, in the concluding part of the judgment of conviction, do nothing more than declare or recite what, in the opinion of the trial court, is the legal effect attending or following a conviction under the statute. They might well have been omitted from the judgment. By its own force, without the aid of such words in the judgment, the statute makes one convicted under it incapable forever thereafter of holding any office of honor, trust or profit under the Government of the United States. But the final judgment of conviction did not operate, *ipso facto*, to vacate the seat of the convicted Senator, nor compel the Senate to expel him or to regard him as expelled by force alone of the judgment. The seat into which he was originally inducted as a Senator from Kansas could only become vacant by his death, or by expiration of his term of office, or by some direct action on the part of the Senate in the exercise of its constitutional powers. This must be so for the further reason that the declaration in section 1782, that any one convicted under its provisions shall be incapable of holding any office of honor, trust or profit "under the Government of the United States" refers only to officers created by or existing under the direct authority of the National Government as organized under the Constitution, and not to offices the appointments to which are made by the States, acting separately, albeit proceeding, in respect of such appointments, under the sanction of that instrument. While the Senate, as a branch of the Legislative Department,

VOL. CCII—24

owes its existence to the Constitution, and participates in pass-ing laws that concern the entire country, its members -are chosen by state legislatures, and cannot properly be said to hold their places "under the Government of the United States."

We are of opinion that section 1782 does not by its necessary operation impinge upon the authority or powers of the Senate of the United States, nor interfere with the legitimate functions, privileges or rights of Senators.

2. It is next contended that the indictment does not present the case of a proceeding, matter or thing in which, within the meaning of the statute, the United States was a party or inter-ested, nor adequately state the facts constituting the offense. These objections are, we think, without merit. Our reading of the statute and the indictment leads to the opposite conclusion.

The statute makes it an offense for a Senator, after his elec-tion, and during his continuance in office, to receive or agree to receive compensation, in any form, from any person, in re-lation to a proceeding, matter or thing before a Department, in which the United States is a party, or directly or indirectly interested. The scope of the statute is, in our judgment, most manifest, and the nature of the offense denounced cannot well be made clearer than it has been made by the words used to express the legislative intent. The business in respect of which the accused is charged to have both agreed to receive, and to have received, compensation, was plainly a proceeding or mat-ter in which the United States was interested. That such pro-ceeding or matter involved the pecuniary interests of the de-fendant's client is not denied. That it also involved the use of the property as well as postal facilities furnished by the United States for carrying and transporting mail matter must also be admitted. · What the Post Office Department aimed to do in the execution of the acts of Congress and the regulations established under those acts was to protect the mails of the United States from being used, in violation of law, to promote schemes for obtaining money and property by means of false and fraudulent pretenses, representations and promises. That

statute has its sanction in the power of the United States, by legislation, to designate what may be carried in the mails and what must be excluded therefrom; such designation and exclusion to be, however, consistent with the rights of the people as reserved by the Constitution. *Ex parte Jackson,* 96 U. S. 727, 732; *In re Rapier,* 143 U. S. 110; *School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94; *Public Clearing House* v. *Coyne,* 194 U. S. 497, 508. In the proceeding, matter and thing before the Department, with which the defendant was connected as an attorney for a corporation immediately concerned in the result, the Postmaster General represented the United States, and, in the discharge of his official duties, sought to enforce a law of the United States. The United States was the real party in interest on one side, while the Rialto Company was the real party in interest on the other side. If the Postmaster General did not represent the United States, whom did he represent? The word "interested" has different meanings, as can be readily ascertained by examining books and the adjudged cases. 4 Words and Phrases Judicially Defined, 3692; Stroud's Judicial Dictionary, 399. But its meaning here is to be ascertained by considering the subject matter of the statute in which the word appears. And it is, we think, a mistake to say that the United States was not interested, directly or indirectly, in protecting its property, that is, its mails and postal facilities, against improper and illegal use, and in the enforcement, through the agency of one of its Departments, of a statute regulating such use. It would give too narrow an interpretation to the statute to hold that the United States was not interested, directly or indirectly, in a proceeding in the Department having such objects in view. It is true the business before the Post Office Department in which the Rialto Company was concerned did not assume the form of a suit in which there were parties according to the technical rules of pleading. But it was, nevertheless, in a substantial sense, a proceeding, matter or thing before an executive Department in which both the United States and the Rialto Company were interested.

It is said that, within the meaning of the statute, the United States is not interested in any proceeding or matter pending before an executive Department, unless it has a direct moneyed or pecuniary interest in the result. Under this view, Senators, Representatives and Delegates in Congress, who are members of the bar, may regularly practice their profession *for compensation* before the executive Departments in proceedings, which if not directly involving the pecuniary interests of the United States, yet involve substantial pecuniary interests for their clients as well as the enforcement of the laws of the United States enacted for the protection of the rights of the public. Such a view rests upon an interpretation of the statute which is wholly inadmissible. In our opinion, section 1782 excludes the possibility of such a condition of things, and makes it illegal for Senators, Representatives or Delegates to receive or agree to receive compensation for such services. We may add that the judgment in *Burton* v. *United States*, 196 U. S. 283, proceeded upon the ground that the case then made—and the present case, as to the facts, is much stronger against the defendant—was embraced by the statute.

It is equally true that the accused was informed with reasonable certainty by the indictment of the nature and cause of the accusation against him—the two counts hereinbefore given at large, and upon which sentences were pronounced, being as full as any of the others. The averments of the indictment were sufficient to enable the defendant to prepare his defense, and in the event of acquittal or conviction the judgment could have been pleaded in bar of a second prosecution for the same offense. The accused was not entitled to more, nor could he demand that all the special or particular means employed in the commission of the offense should be more fully set out in the indictment. The words of the indictment directly and without ambiguity disclosed all the elements essential to the commission of the offense charged, and, therefore, within the meaning of the Constitution and according to the rules of pleading, the defendant was informed of the nature and cause of the

accusation against him. *United States* v. *Simmons*, 96 U. S. 360, 362; *United States* v. *Carll*, 105 U. S. 611; *Blitz* v. *United States*, 153 U. S. 308, 315.

3. It is insisted, however, that the court below erred in not directing the jury to acquit the defendant; in other words, that the evidence in support of the indictment was so meager that the jury could not properly have found him guilty of any offense. We cannot assent to this view. There was beyond question evidence tending to establish on one side the defendant's guilt of the charges preferred against him; on the other side, his innocence of those charges. It will serve no useful purpose to set out all the testimony. It is sufficient to say that the whole evidence has been subjected to the most careful scrutiny, and our conclusion is that the trial court was not authorized to take the case from the jury and direct a verdict of not guilty. That course could not have been pursued consistently with the principles that underlie the system of trial by jury. The case was preëminently one for the determination of a jury. It was for the jury to pass upon the facts; and as there was sufficient evidence to go to the jury, this court will not weigh the facts, and determine the guilt or innocence of the accused by the mere preponderance of evidence, but will limit its decision to questions of law. In its charge to the jury the Circuit Court held the scales of justice in even balance, saying all that was necessary to guard the rights of the accused. Nothing seems to have been omitted that ought to have been said nor anything said that was not entirely appropriate. Upon the general question of guilt or innocence and as to the rules by which the jury should be guided in their consideration of the case, the Circuit Court, in substance, said that the indictment was not evidence in any sense, but only an accusation which it was incumbent upon the Government to sustain by proof establishing guilt beyond a reasonable doubt; that the presumption of law was that he was innocent of the accusation as a whole and as to every material element of it, and that such presumption abided with him from the beginning to the end of

the trial, and required, at the hands of the jury, an acquittal, unless a careful, intelligent, fair consideration of the whole evidence, attended by the presumption of innocence, produced in the mind, beyond a reasonable doubt, the conviction that the defendant was guilty; and that they, the jury, were the sole judges of the credibility of the witnesses and of the weight to be attached to their testimony.

The Circuit Court was equally direct and impartial in what it said in relation to the particular issues of fact raised by the indictment and evidence. After explaining the nature of the proceeding before the Post Office Department, in respect of which, the indictment alleged, the defendant acted as counsel for the Rialto Company, for compensation received and to be received, and after referring, with some fulness, to the specific charges in the several counts, the court called attention to the questions that were common to all the counts. It said to the jury: "Was the defendant a Senator of the United States for the State of Kansas during the times covered by the transactions under investigation? It is admitted that he was, and therefore you will have no difficulty in determining that. Was the Rialto Grain and Securities Company an existing corporation carrying on business of the character described during the times covered by the transactions under investigation? There was proof that it was, and no proof to the contrary, so you will have no difficulty with that. Was a proceeding pending before the Post Office Department from November 18, 1902, to March 26, 1903, to determine whether or not a fraud order should be issued against that company? If the evidence shows that the officers of the Post Office Department, at the instance of private individuals or otherwise, had before that time set on foot an inquiry to determine whether or not satisfactory evidence existed that the Rialto Grain and Securities Company was engaged in conducting a scheme or device for obtaining money through the mails by means of false or fraudulent pretenses, representations or promises, as charged in the indictment; and if the evidence further shows that that inquiry had

not been concluded, and was, during the period named, in the charge of any of the officers of the Post Office Department then charged with the performance of any duty in respect of such inquiry—then I charge you that there was such a pending proceeding before the Post Office Department, as described in the indictment, and is referred to in the statutes before mentioned; and also that it was a proceeding in which the United States was both directly and indirectly interested."

It then called the attention of the jury to the particular counts charging the defendant with having *agreed* with the Rialto Company to receive a stated compensation for services to be rendered in the proceeding before named. Touching those counts, the court said: "Did he make such an agreement? That he made an agreement of some character to act as counsel for that company for a stated compensation is conceded. The real question is whether that agreement included, among other matters in relation to which he was to serve the company, the proceeding in the Post Office Department before named. Upon that question the evidence is conflicting, and it is your duty to weigh the evidence and determine the truth. If, among other things, it was intended by the defendant and the Rialto Grain and Securities Company in making the agreement that he would, in part consideration for the compensation he was to receive, appear as agent or attorney of such company before the Post Office Department, or any of its officers charged with any duty or having any authority over such fraud order proceeding, for the purpose or with the intent of influencing or obtaining action on their part favorable to such company in said proceeding, whether by way of stopping the investigation or ultimately preventing the issuance of a fraud order: then I charge you that the agreement of the defendant was violative of the statute; otherwise it was not. The offense prescribed in the statute consists in the agreement to receive compensation for the rendition of such services. The mere agreement to render the services is not an offense. It is the agreement to receive compensation for the rendering of them

which constitutes the offense. It should be carefully observed that the actual rendition of services is not a necessary element of this offense. The offense is complete and the defendant's guilt is established if the evidence shows that he made an agreement to render such services for compensation."

Coming then to the questions referring exclusively to the counts charging defendant with having *received* from the Rialto Company compensation for services rendered by him to it, the court said to the jury: "Did he render any service for the Rialto Grain and Securities Company before the Post Office Department in the proceeding named? On that question I charge you that if he appeared as agent or attorney of such company before the Post Office Department, or any of its officers charged with any duty or having any authority over such fraud order proceeding, for the purpose or with the intent of influencing or obtaining action on their part favorable to such company in said proceeding, and did then, by any statement or representation respecting the business in which that company was engaged, or the manner in which it was conducting such business, endeavor to obtain any action favorable to such company on the part of the Post Office Department, or any of its officers, in such fraud order proceeding, then he rendered service for said company within the meaning of the statute. And I further charge you that if he appeared as agent or attorney of such company before the Post Office Department, or any of its officers charged with any duty or having any authority over such fraud order proceeding, for the purpose or with the intent of influencing them in respect to their action in said proceeding, and did then arrange with the Department, or any of its officers, that a hearing should be had in respect of such matter, and then also assured the Department, or any of its officers, that it was the purpose of said company to comply strictly with the law, and then also arranged that no action should be taken against said company in said proceeding without his being first notified thereof, that would constitute services within the meaning of the statute. Did he, at St. Louis,

Missouri, on the twenty-sixth day of March, 1903, receive from the Rialto Grain and Securities Company any payment of money as compensation for such services? " Here the court gave instructions, seven in number, asked by the defendant. They were not objected to by the Government and need not be set out.

4. Another point made by the defendant is that he could not legally be indicted for two separate offenses, one for agreeing to receive compensation in violation of the statute, and the other for receiving such compensation. This is an erroneous interpretation of the statute, and does violence to its words. It was certainly competent for Congress to make the agreement to receive, as well as the receiving of, the forbidden compensation separate, distinct offenses. The statute, in apt words, expresses that thought by saying: "No Senator  .  .  . shall receive *or* agree to receive any compensation whatever, directly or indirectly, for any services rendered or to be rendered," etc. There might be an agreement to receive compensation for services to be rendered without any compensation ever being in fact made, and yet that agreement would be covered by the statute as an offense. Or, compensation might be received for the forbidden services without any previous agreement, and yet the statute would be violated. In this case, the subject matter of the sixth count, which charged an agreement to receive $2,500, was more extensive than that charged in the seventh count, which alleged the receipt of $500. But Congress intended to place its condemnation upon each distinct, separate part of every transaction coming within the mischiefs intended to be reached and remedied. Therefore an agreement to receive compensation was made an offense. So the receiving of compensation in violation of the statute, whether pursuant to a previous agreement or not, was made another and separate offense. There is, in our judgment, no escape from this interpretation consistently with the established rule that the intention of the legislature must govern. in the interpretation of a statute. "It is the legislature, not

the court, which is to define a crime, and ordain its punishment." *United States* v. *Wiltberger,* 5 Wheat. 76, 95; *Hackfeld & Co.* v. *United States,* 197 U. S. 442, 450.

5. The defendant invokes the protection of that clause of the Constitution of the United States which declares that no person "shall be subject for the same offense to be twice put in jeopardy of life or limb." The question arose in this way.

The first and second counts of the indictment in the former case charged that the defendant, in violation of the statute, and on March 26, 1903, unlawfully, knowingly, wilfully and corruptly took, accepted and received $500 "from the Rialto Grain and Securities Company," for services rendered in its behalf in a matter before the Post Office Department in which the United States was interested. Those two counts differed only as to the interest, whether direct or indirect, of the United States in that matter. The third count in the former indictment charged that on March 26, 1903, the defendant unlawfully, knowingly, wilfully and corruptly took, accepted and received $500 "from one W. D. Mahaney," (described as an officer and employé of the Rialto Company,) as compensation for services rendered by defendant to that company in a matter before the Post Office Department in which the United States was directly interested. The jury in the former case convicted the defendant on the first and second counts and acquitted him on the third count; in other words, they found, in effect, that he received money from the company, but not from Mahaney. Upon writ of error sued out by defendant this court reversed the judgment and sent the case back with directions for a new trial. Whether that reversal, upon defendant's own writ of error, had the effect, within the principle of *Trono* v. *United States,* 199 U. S. 521, to take from him the benefit of his acquittal on the third count in the former case, we need not decide. It may be assumed, for the purposes of this discussion, that it did not.

The defendant pleaded the judgment of acquittal on the third count in the former indictment in bar of this prosecution

as based on the third and seventh counts in the present indictment. In its answer to that plea the Government alleged that while the third and seventh counts of the present indictment are identical in legal effect with counts one and two of the former indictment, "the offense charged against the defendant in said counts three and seven of the indictment herein is not identical in legal effect with said count three of said original indictment." The defendant, as we have seen, demurred to the answer. The demurrer having been overruled, and the defendant declining to plead further, the plea in bar was overruled and denied.

As no issue was taken upon the answer, by replication, the question presented is whether, upon the face of the record, *as matter of law* simply, the offense charged in the third and seventh counts of the present indictment is the same as that charged in the third count of the former indictment. This question must be answered in the negative, unless the charge, in the present indictment, that the money in question was received by the defendant "from the Rialto Grain and Securities Company" is the same, in law, as the charge, in the former indictment, that he received it "from one W. D. Mahaney," mentioned as an officer and employé of the Rialto Grain and Securities Company. We could not so hold, for the reason that the two charges do not necessarily import, in law, the same thing. The only support for the contrary view is found in the words, added after Mahaney's name, describing him to be an officer and employé of the Rialto Company. But those words are to be taken only as descriptive of the person or as identifying the person from whom, it was charged, the defendant, in fact, received the money. It was not alleged in the former indictment that Mahaney paid the money to the defendant in behalf of or by direction of the company. This distinction was manifestly in the mind of the jury in the former case; for, while they found the defendant guilty of having received forbidden compensation from the company, they found him not guilty of having received such compensation from Mahaney.

The defendant may have received such compensation from Mahaney, but it may not have been paid by direction of the company. . So, in a legal sense, it may have been received from the company, although paid by the hands of Mahaney. It cannot be held otherwise, as matter of law, upon the face of the two indictments, apart from any evidence. And there was no evidence in support of the plea or in refutation of the answer. The defendant simply demurred to the answer, thereby admitting its averments of fact; and, without a replication, and without any evidence, rested his defense of former jeopardy upon the face of the two indictments. As the effect of the reversal of the judgment in the former case was to set aside the judgment of conviction on the first and second counts of the original indictment, the way was opened for another trial on those counts. But the Government elected not to proceed under that indictment, but to have a new one embodying the same charge as to the $500 that was made in the former case. Its right to adopt that course cannot be questioned. In our judgment, the defendant cannot plead his acquittal upon the charge of having received forbidden compensation *from Mahaney* in bar of a prosecution upon the charge of having received such compensation *from the company.* A plea of *autrefois acquit* must be upon a prosecution for the same identical offense. 4 Bl. 336. It must appear that the offense charged, using the words of Chief Justice Shaw, "was the same *in law* and *in fact.* The plea will be vicious, if the offenses charged in the two indictments be perfectly distinct in point of law, *however nearly they may be connected in fact."* *Commonwealth* v. *Roby,* 12 Pick. 496, 504. Looking, as we must, only at the face of the original and the present indictments, the two charges must be regarded as separate and distinct. The plea of former jeopardy in this case presents a technical defense, and cannot be allowed for the reason that the offense of which the defendant was heretofore acquitted does not plainly appear, as matter of law, upon the face of the record, to be identical with the one of which he has been convicted in this case.

If, at the trial below, under the present indictment, proof had been made that the $500 was paid by Mahaney, and that he was an officer and employé of the Rialto Company—if the proof had gone no farther—the jury would not have been authorized to find that the money was received *from the company;* whereas, the same proof would have sustained the charge in the third count of the original indictment. This shows that the two charges were not identical, in law, and that the same evidence would not have sustained each. It is well settled that "the jeopardy is not the same when the two indictments are so diverse as to preclude the same evidence from sustaining both." 1 Bishop's Crim. Law, § 1051; *Wilson* v. *State*, 24 Connecticut, 57, 63, 64. For these reasons we hold that the court below properly sustained the answer to the plea and, the defendant not pleading further, the plea in bar was properly overruled and denied.

6. An important point remains to be considered. It relates to the jurisdiction of the court below to try the defendant for the crime alleged.

The Constitution requires that the trial of all crimes against the United States shall be held in the State and the District where *such crimes* shall have been committed. Const. Art. 3, § 2, Sixth Amendment. The contention of the accused is that in no view of the evidence can he be said to have committed any offense in the State of Missouri; consequently, the Federal court, holden at St. Louis, was without jurisdiction, under the Constitution, to try him. The contention of the Government is that the alleged offense was committed at St. Louis, and that it was proper to try the defendant in the District embracing that city.

The Circuit Court thus instructed the jury: "If there was an agreement on the part of the defendant to receive compensation for services to be rendered by him in such a fraud order proceeding, was the agreement made within the jurisdiction of this court—in other words, was it made in St. Louis, Missouri? Upon this question I charge you that if such an agreement was

negotiated or tentatively affected at some other place, but with the understanding on the part of the defendant that it should be communicated to the Rialto Grain and Securities Company at St. Louis, Missouri, to be there accepted or ratified by that company before it should become effective, and if thereafter, in pursuance of such understanding the proposed or tentative agreement was communicated to the Rialto Grain and Securities Company at St. Louis, Missouri, and was there accepted and ratified by that company without any change in its terms, then the agreement was made at St. Louis, Missouri, and within the jurisdiction of this court. The fact that the defendant was notified of such acceptance or ratification by telegram or letter sent to him at Washington would not alter this result, if the circumstances under which the negotiations were had and the tentative agreement was made were such that it can be reasonably inferred that he contemplated and assented to notice of the acceptance of his proposition being communicated to him through that medium."

The jury found that the alleged agreement was consummated, that is, completed, at St. Louis. This finding was clearly justified by the evidence. There was proof that on the seventeenth day of November, 1902, the general counsel of the Rialto Company—while he and the accused were in Illinois traveling together from St. Louis to Chicago—explained to the latter the affairs and condition of the company and invited the defendant to become counsel with him for the company; that, as the result of that conference and invitation, the defendant, being in Illinois at the time, proposed or offered to become such counsel on the basis of an employment for not less than five months at a monthly salary of $500; that he was then informed that only the company could conclude an arrangement as to compensation; that he contemplated, at the time, that his offer as to employment and compensation would be submitted for him to the company at St. Louis; that upon the return of the company's counsel to St. Louis on the morning of November 18, 1902, he at once communicated to the

Rialto company, at that city, the above offer or proposal of the defendant; that the company promptly accepted the offer, of which fact the defendant was immediately informed by telegram of November 18, 1902, sent from St. Louis, and addressed to him at Washington, by the representative of the company; that such acceptance was confirmed by a letter written and duly mailed at St. Louis on the same day, in which letter counsel, speaking for the company, said: "I hope you received my message to the effect that this company accepts your terms to act as counsel at a salary of $500 per month, and service to begin immediately, that is, of this date, November 18, 1902; " that under date of November 20, 1902, by letter addressed to the Rialto counsel at St. Louis, the defendant acknowledged receipt by due course of mail of the above letter of November 18, and stated that he had called that morning at the Department, on behalf of the company, and had found that two complaints had been filed there against it, which had been sent out on November 7 for investigation; that the letter last referred to thus concluded: "I have arranged with the Department to be advised in case any complaints are made against your company, and have arranged for a hearing if any hearing should become necessary. I have assured the Department that it is the purpose of your company to comply strictly with the law, and that it is your desire to remain at all times in perfect harmony with the Department. No action of any kind will be taken against you without my first being notified, and every opportunity for a full explanation or hearing will be had. In return, if agreeable, you may make remittance for my first month's pay."

The evidence further tended to show that during the five months following the acceptance of his offer at St. Louis, the defendant acted as counsel for the Rialto Company before the Post Office Department when requested or when it was necessary, and received from the company a salary of $500 per month for his services to it—the salary for each of the first four months being paid by the company's check, drawn at

St. Louis upon a St. Louis bank and made payable to the defendant's order, which check was sent from St. Louis to the defendant at Washington. The last month's salary of $500 was paid in cash to defendant at St. Louis, in the company's office, on March, 26, 1903, on which date, with his own consent, he was discharged as the company's attorney, his services being no longer required. The evidence also tended to show that during the whole period of the defendant's employment and service as the company's attorney he relied or counted upon the acceptance of his offer on the eighteenth day of November, 1902, as evidencing an agreement then concluded between him and the company in respect of compensation. He received the letter of November 18, by due course of mail, and does not deny having received the telegram previously sent to him, the same day, on the same subject. Nothing was said or done by him during the whole period of his service as the company's counsel that was inconsistent with the agreement established by the evidence. All that he did, said or wrote was consistent with the idea that he regarded the acceptance at St. Louis, of his offer, as completing the agreement between him and the company. From the time of such acceptance he was entitled, so far as the agreement was concerned, to demand, and he in fact received, the stipulated salary.

In view of the evidence and of all the circumstances, was the jury warranted in finding that the alleged agreement was concluded at St. Louis? Manifestly so, we think. Although this is a criminal prosecution, that question must be determined by the principles recognized in the general law of contracts as to the time when an agreement between parties takes effect and becomes binding upon them. It is to be taken as settled law, both in this country and in England, in cases of contracts between parties distant from each other, but communicating in modes recognized in commercial business, that when an offer is made by one person to another, the minds of the parties meet and a contract is to be deemed concluded, when the offer is accepted in reasonable time, either by tele-

gram duly sent in the ordinary way, or by letter duly posted to the proposer, provided either be done before the offer is withdrawn, to the knowledge of or upon notice to the other party. A leading authority on the general subject is *Tayloe* v. *Merchants' Fire Ins. Co.*, 9 How. 390, 399, 400. It appeared in that case that a fire insurance company made an offer by mail to insure property upon certain terms. The offer was accepted in a letter promptly mailed to the proper address of the company. The inquiry arose as to the time when the contract of insurance was to be deemed completed. This court held that, according to the settled principles of law governing contracts entered into by correspondence between parties distant from each other, the contract became complete when the letter accepting the offered terms was mailed, the offer not having been then withdrawn. The court said: "We are of opinion that an offer under the circumstances stated, prescribing the terms of insurance, is intended, and is to be deemed, a valid undertaking on the part of the company, that they will be bound, according to the terms tendered, if an answer is transmitted in due course of mail, accepting them; and that it cannot be withdrawn, unless the withdrawal reaches the party to whom it is addressed before his letter of reply announcing the acceptance has been transmitted."

In *Patrick* v. *Bowman*, 149 U. S. 411, 424, the court, referring to the *Tayloe* case, again held that when an offer is made and accepted by the posting of a letter of acceptance the contract is complete according to the terms of the offer.

Kent says: "In creating the contract the negotiation may be conducted by letter, as is very common in mercantile transactions; and the contract is complete when the answer containing the acceptance of a distinct proposition is dispatched by mail or otherwise, provided it be done with due diligence, after the receipt of the letter containing the proposal, and before any intimation is received that the offer is withdrawn. Putting the answer by letter in the mail containing the acceptance, and thus placing it beyond the control of the party, is

valid as a constructive notice of acceptance. An offer by letter, or by a special agent, is an authority revocable in itself, but not to be revoked without notice to the party receiving it, and never after it has been executed by an acceptance. There would be no certainty in making contracts through the medium of the mail, if the rule were otherwise." 2 Kent's Com. 477.

The authorities to the same effect are too numerous to be cited, but we refer particularly to *Vassar* v. *Camp*, 11 N. Y. 441, 445; *Mactier* v. *Frith,* 6 Wend. 103; *Adams* v. *Lindsell,* 1 B. & Ald. 681; *Imperial Land Co. of Marseilles*, 7 L. R. Ch. App. 587; *Household Fire Ins. Co.* v. *Grant*, L. R. 4 Exch. Div. 216, 218; *Perry* v. *Mt. Hope Iron Co.*, 15 R. I. 380, 381; *Wheat* v. *Cross*, 31 Maryland, 99, 103; *Averill* v. *Hedge*, 12 Connecticut, 424; *Chiles* v. *Nelson*, 7 Dana, 281; *Washburn* v. *Fletcher*, 42 Wisconsin, 152; *Minnesota Oil Co.* v. *Collier Lead Co.*, 4 Dill. 431, 434; *Maclay* v. *Harvey*, 32 Am. Rep. 35, 40, note and authorities cited; *Levy* v. *Cohen*, 4 Georgia, 1, 13; *Falls* v. *Gaither*, 9 Port. 605, 612; 2 Redfield on Law of Railways, 338, 339; Pomeroy on Contracts, 95; 1 Parsons on Contracts, 9th ed. 483; 2 Parsons on Contracts, 257, note; Metcalf on Contracts, 17; Thompson on Law of Electricity, §§ 425–478; Scott and Jarnogin, Law of Telegraphs, § 295 *et seq.;* Addison on Contracts, 16, 17. Whether the acceptance by the Rialto Company of the defendant's offer is to be regarded as effectively made by the telegram duly sent to him, or only when the letter addressed to him by the Rialto counsel was duly mailed at St. Louis, or in both ways—in any event, the acceptance promptly and adequately occurred on the eighteenth of November, 1902, at St. Louis, on which day and at which place it is to be deemed that the minds of the parties met— the agreement becoming complete the moment of the acceptance of defendant's offer, without the necessity of formal notice to the company that Burton had received information of its acceptance of his offer.

But this, the defendant insists, is not enough to show that

the alleged offense was committed at St. Louis.   Counsel would seem to contend that the physical absence of the accused from St. Louis, when the offer was received by the company and when the agreement was concluded, rendered it impossible that he could have committed the alleged offense *at that city*.   In substance, the contention is that an individual could not, in law or within the meaning of the Constitution, commit a crime within a State in which he is not physically present at the time the crime is committed.

The constitutional requirement is that the *crime* shall be tried in the State and District where committed, not necessarily in the State or District where the party committing it happened to be at the time.   This distinction was brought out and recognized in *Palliser's* case, 136 U. S. 257, 265.   Palliser was indicted in the District Court of the United States for the District of Connecticut for violating certain statutes relating to the disposal of postage stamps and forbidding postmasters not only to dispose of postage stamps in the payment of debts or in the purchase of commodities or to pledge them, but also to sell or dispose of them except for cash.   By letter written and mailed at New York and addressed to a postmaster in Connecticut, Palliser made to that officer an offer of contract which could not have been accepted by the latter without violating the above statutes.   This court held that the offer in Palliser's letter was a tender of a contract with the intent to induce the postmaster to sell postage stamps for credit in violation of his duty, and that the case, therefore, came within section 5451 of the Revised Statutes, providing that "every person who promises, offers, or gives or causes or procures to be promised, offered or given, any money or other thing of value, or makes or tenders any contract, undertaking, obligation, gratuity or security for the payment of money, or for the delivery or conveyance of anything of value to any officer of the United States, ... with intent to influence him to commit or aid in committing, or to collude in or allow any fraud, or make opportunity for the commission of any fraud on the United States,

or to induce him to do or omit to do any act in violation of his lawful duty, shall be punished" by fine and imprisonment.

The question arose whether Palliser, who did not go into Connecticut, could be punished in that State for the offense alleged against him. This court, speaking by Mr. Justice Gray, said: "The petitioner relies on those provisions of the Constitution of the United States which declare that in all criminal prosecutions the accused shall have the right to be tried by an impartial jury of the State and District wherein the crime shall have been committed. Art. 3, § 2; Amendments, art. 6. But the right thereby secured is not a right to be tried in the District where the accused resides, or even in the District in which he is personally at the time of committing the crime, but in the District 'wherein the crime shall have been committed.' . . . When a crime is committed partly in one District and partly in another it must, in order to prevent an absolute failure of justice, be tried in either District, or in that one which the legislature may designate; and Congress has accordingly provided, that 'when any offense against the United States is begun in one judicial District and completed in any other, it shall be deemed to have been committed in either, and may be dealt with, inquired of, tried, determined and punished in either District, in the same manner as if it had been actually and wholly committed therein.' Rev. Stat. § 731." In that case the court said it was universally admitted that when a shot fired in one jurisdiction strikes a person in another jurisdiction, the offender may be tried where the shot takes effect.

If the sending by the defendant to the Rialto Company from Chicago to St. Louis of the offer above referred to was the beginning of negotiations for an agreement in violation of section 1782, the agreement between the parties was completed at the time of the acceptance of the defendant's offer at St. Louis on November 18, 1902. Then the offense was committed; and it was committed, at St. Louis, notwithstanding the defendant was not personally present in Missouri when his offer was accepted and the agreement was completed.

The principle announced in *Palliser's* case was reaffirmed in *Horner* v. *United States,* 143 U. S. 207, in which it was held that the District Court of the United States in Illinois had jurisdiction to try one charged with having violated the statute relating to the sending of lottery matter in the mails, in that he had unlawfully caused to be delivered to a certain person in that District lottery circulars conveyed by mail in a sealed letter that he had deposited in the mail at New York, addressed to and to be delivered to such person in Illinois. The fact that the accused was in New York when the lottery circulars were mailed, and not personally present in Illinois when the offense was completed by the delivery there of the lottery circulars to the person to whom they were sent, was held to be immaterial and not to defeat the jurisdiction of the Federal court in Illinois to try the accused.

It cannot be maintained, according to the adjudged cases, that the personal absence of the defendant Burton from St. Louis, at the time his offer was accepted, and when the agreement between him and the company was completed and became binding, as between the parties, deprived the Federal court there of jurisdiction. He sent his offer to St. Louis with the intent that it should be there accepted and consummated. Having been completed at that city in conformity with the intention of both parties, an offense was, in the eye of the law, committed there, and when the court below assumed jurisdiction of this case it did not offend the constitutional requirement that a crime against the United States shall be tried in the State and District where it was committed.

Other questions were discussed by counsel, but we have alluded to all involving the substantial rights of the accused that are mentioned in their briefs of points and authorities, and which we deem it necessary to notice.

MR. JUSTICE MCKENNA concurs in the judgment based on the count charging the receipt of forbidden compensation, but does not concur in the judgment on the count charging simply an agreement to receive compensation. He is of opinion that

the agreement to receive and the receipt of compensation constitute under the circumstances of this case but one offense.

*Judgment affirmed.*

MR. JUSTICE BREWER, with whom MR. JUSTICE WHITE and MR. JUSTICE PECKHAM concurred, dissenting.

A conviction of plaintiff in error on an indictment charging substantially the same offenses as are charged in the present case was reversed by this court. 196 U. S. 283. In the opinion then filed it was stated that four Justices of this court (the writer of this being among the number) were of the opinion that the matters charged against the defendant were not made offenses by the statute under which the indictment was found. Nothing was said in that opinion in respect to this matter beyond the simple statement of the conclusions of the several Justices. As one of the four I think the importance of the case justifies me in stating the reasons which led to that conclusion, and which induces belief that the present conviction is wrongful.

The statute (sec. 1782, Rev. Stat.) forbids a Senator or other official of the Government to "receive or agree to receive any compensation whatever, directly or indirectly, for any services rendered, or to be rendered, to any person, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or other matter or thing in which the United States is a party, or directly or indirectly interested, before any Department, court-martial, bureau, officer, or any civil, military, or naval commission whatever." It was charged in the indictment that there was pending in the Post Office Department a proceeding to inquire whether the Rialto Grain and Securities Company was conducting a scheme for obtaining money by false pretenses through the mails of the United States and whether a fraud order, as it is called, should be issued against said company, and that the defendant, as a Senator of the United States, unlawfully agreed to

receive from the said corporation compensation for services rendered by him in relation to such proceeding before that Department. It was not charged that the United States was a party to the proceeding, nor that it would either make or lose any money or property, whatever might be the result, but only that it was directly and indirectly interested. The question is therefore distinctly presented whether a proceeding in one of the Departments of the Government, in which it does not appear that the United States is pecuniarily interested in the result, will neither make nor lose by the issue of the proceeding, whatever it may be, is one in which it is "directly or indirectly interested." Unless the statute by clear intendment includes the transaction, any extension beyond its meaning so as to include the transaction would be, under the elementary rule governing the interpretation of criminal statutes, simply judicial legislation, as it would be by judicial construction making that a crime which Congress has not so made, and thereupon imposing punishment. *United States* v. *Wiltberger,* 5 Wheat. 76; *Sarlls* v. *United States,* 152 U. S. 570; *United States* v. *Harris,* 177 U. S. 305. There is a certain broad sense in which the word "interest" is sometimes used, which describes the relation which the Government has to the acts of all its officials, to all proceedings in courts or in Departments, and indeed to the conduct of all its citizens. It is interested in seeing justice and righteousness obtain everywhere. It is interested in seeing that no wrongful conduct shall prevail. But so is every official and every citizen interested. It is not an interest which separates and distinguishes the Government from the citizens, but it is that interest which all have, whether government or citizens, in the orderly and just management of affairs, in honorable and right living. It is that interest which a father or head of a family has in the good conduct of all the members of his family. But the word "interest" as found in the law books refers to pecuniary profit and loss, and that Congress used the word "interested" in its common legal acceptation is as clear and certain as anything can be.

It is well to inquire in the first place whether the word "interest" or "interested" has a settled legal meaning. A leading case is that of *Inhabitants of Northampton* v. *Smith*, 11 Met. (Mass.) 390, in which was involved the construction of a statute of Massachusetts which provided that when a judge of probate was interested in any case within his jurisdiction the case should be transferred to the most ancient adjoining county. The probate judge transferred the case on the ground that he was one of the inhabitants of the town of Amherst, and that there were in the will which was offered for probate many bequests to charitable purposes for the benefit of persons described as dwelling in the eight towns enumerated, of which Amherst was one. Mr. Chief Justice Shaw, delivering the opinion of the court, said (p. 394):

"If the term 'interest' were used in the loose sense it sometimes is, consisting in a strong and sincere desire to promote all enterprises for the advancement of learning, philanthropy, and general charity, or a similar interest, with all good men, to repress and put down pernicious and mischievous schemes, no man could be found, fit to be intrusted with the administration of justice; for no man can be exempt from such interests."

And again (p. 395):

"2. It must be a pecuniary or proprietary interest, a relation by which, as a debtor or creditor, an heir or legatee, or otherwise, he will gain or lose something by the result of the proceedings, in contradistinction to an interest of feeling or sympathy or bias, which would disqualify a juror. *Smith* v. *Bradstreet*, 16 Pick. 264.

"3. It must be certain, and not merely possible or contingent. *Hawes* v. *Humphrey*, 9 Pick. 350; *Wilbraham* v. *County Commissioners*, 11 Pick. 322; *Danvers* v. *County Commissioners*, 2 Met. 185. It must be direct and personal, though such a personal interest may result from a relation, which the judge holds as the member of a town, parish or other corporation,

where it is not otherwise provided by law, if such corporation has a pecuniary or proprietary interest in the proceedings.

"It may be, and probably is, very true, as the human mind is constituted, that an interest in a question or subject matter, arising from feeling and sympathy, may be more efficacious in influencing the judgment, than even a pecuniary interest; but an interest of such a character would be too vague to serve as a test by which to decide so important a question as that of jurisdiction; it would not be capable of precise averment, demonstration and proof; not visible, tangible or susceptible of being put in issue and tried; and therefore not certain enough to afford a practical rule of action."

In *McGrath* v. *People ex rel. Linnemeyer*, 100 Illinois, 464, it was held that:

"The State is not 'interested, as a party or otherwise,' in a proceeding in the nature of a quo warranto to try the title of a person to an office into which it was alleged he had intruded, in any such sense as would give the Supreme Court jurisdiction to hear an appeal in such a proceeding directly from the trial court, under section 88 of the Practice Act. The interest which the State must have in a cause, within the meaning of this section, in order to entitle either party to bring it directly to the Supreme Court from the trial court, is a substantial interest—as, a monetary interest."

In *Evans* v. *Eaton*, 7 Wheat., 356, a patent case, the question was whether a certain witness was competent, the alleged objection being that he was interested, because he might use the alleged invention if the patent was adjudged void, and Mr. Justice Story, speaking for the court, said (p. 425):

"The special notice in this case asserts matter, which if true, and found specially by the jury, might authorize the court to adjudge the patent void; and it is supposed that this constitutes such an interest in Frederick in the event of the cause that he is thereby rendered incompetent. But in this respect Frederick stands in the same situation as every other person in the community. If the patent is declared void, the in-

vention may be used by tne whole community, and all persons may be said to have an interest in making it public property. But this results from a general principle of law, that a party can take nothing by a void patent; and so far as such an interest goes, we think it is to the credit and not to the competency of the witness."

In *State* v. *Sutton*, 74 Vermont, 12, the case and the ruling is disclosed by the following quotation from the opinion:

"This is an indictment under section 5072 of the Vermont Statutes, for defaming this court, and a judgment thereof, and the judges of the court as to said judgment. It is objected that, Judge Watson, who sat below, was disqualified by reason of interest in the event of the cause or matter, for that he is one of the judges alleged to have been defamed. It is a pecuniary interest that disqualifies, and Judge Watson is no more interested in this case in that respect than he is in every other criminal case that he tries, and that interest is too small for the law's notice. *State* v. *Batchelder*, 6 Vermont, 479. It is said that a judge defamed would be deeply interested to have the respondent convicted, not only that he might be severely punished, but also for the aid it might afford him in the prosecution and maintenance of a civil action for damages. But such an interest does not disqualify."

In *Foreman* v. *Town of Marianna*, 43 Arkansas, 324, it was held that a judge who was a taxpayer in a town was not disqualified from sitting in a case relating to the annexation of certain territory to the town, the court saying (p. 329):

"A general interest in a public proceeding, which a judge feels in common with a mass of citizens, does not disqualify. If it did, we might chance to have to go out of the State at times for a judge. The 'interest' which disqualifies a judge under the constitution is not the kind of interest which one feels in public proceedings or public measures. It must be a pecuniary or property interest, or one affecting his individual rights; and the liability or pecuniary gain or relief to the judge must occur upon the event of the suit, not result re-

motely, in the future, from the general operation of laws and government upon the status fixed by the decision."

In *Taylor* v. *Commissioners of Highways &c.*, 88 Illinois, 526, the question was who had the right to appeal from the decision of the commissioners of highways in laying out a new road or vacating an old one, and the court said:

"The word 'interested' must receive a reasonable construction, such as will, on the one hand, protect those who have a direct and substantial interest in the matter, and on the other hand, protect the commissioners of highways from unnecessary litigation in defending their action as such, at the suit of persons who may imagine they have an interest, when in fact they have no such interest as was contemplated by the legislature. Every citizen of a county, in one sense, has an interest in the public highways. So, too, it may be said, and properly, that every citizen of the State has an interest in the highways in the different counties of the State. If, therefore, the language of the statute is to be interpreted literally, an appeal might be taken by any citizen of the State. But we apprehend it was not the intention of the legislature that the word 'interested' should receive such a liberal construction. It was, doubtless, intended to give the right of appeal to those persons who had a direct and pecuniary interest not shared by the public at large, such as owned land adjoining the new road laid out or the old one vacated."

In *Chicago, Burlington & Quincy Railroad Company* v. *Kellogg*, 54 Nebraska, 138, in deciding whether a trial judge was disqualified, this was the ruling:

" 'A judge is disqualified from acting as such . . . in any case wherein he is . . . interested.' But the word 'interested,' found in this section of the statute, probably means pecuniarily interested, or, at least, it means that a judge, to be disqualified from hearing a case, must be in such a situation with reference to it or the parties that he will gain or lose something by the result of the action on trial. It is not claimed that Judge Beall will gain or lose anything from the result of

this action. It is not pretended that he has any pecuniary interest in the matter. The argument seems to. be that, because he rendered a law judgment, he would naturally be desirous that the same should be sustained, and that, therefore, his inclination would be to defeat this suit. It can never be presumed that a judge will permit his desires or inclinations to control his decision in any manner, and that he tried the case and rendered the judgment which is sought to be vacated by this action does not render him interested and disqualified within the meaning of said section of the statute."

See also *Commonwealth* v. *O'Neal*, 6 Gray, 343; *Sauls* v. *Freeman*, 24 Florida, 209; *Bowman's Case*, 67 Missouri, 146.

In Bouvier's Law Dictionary, vol. 1, p. 651, "interest" is defined:

"The benefit which a person has in the matter about to be decided and which is in issue between the parties. By the term benefit is here undertsood some pecuniary or other advantage, which if obtained would increase the witness's estate, or some loss, which would decrease it."

In Black's Law Dictionary the definition is (p. 636):

"A relation to the matter in controversy, or to the issue of the suit, in the nature of a prospective gain or loss, which actually does, or presumably might, create a bias or prejudice in the mind, inclining the person to favor one side or the other."

If the word "interested" was not used in this section in this ordinary legal sense, the words "in which the United States is a party, or directly or indirectly interested" are surplusage, because in respect to every proceeding before a Department or other tribunal the United States as *parens patriæ* has an interest in what Chief Justice Shaw calls the "loose" sense of the term. Indeed, what significance is there in inserting the words from "contract" to "interested" inclusive unless some distinct limitation was intended? If the language was "in relation to any proceeding before any Department, court-martial," etc., it would express the intent to exclude

Senators from appearance for compensation in any and all matters before the Departments. Inserting the clause above referred to obviously means a limitation, and no other limitation is suggested except that which limits it to matters in which the Government is pecuniarily interested. Neither do the words "or any other matter or thing" enlarge the scope of the prohibition so as to take in matters of a different nature. The rule of construction regarding the effect of such words when following an enumeration of subjects is that they are to be held as meaning any other matter or thing of a like or similar nature to those already named, so that all subjects of that kind may be included, and none escape by reason of not being specially named. They do not open the statute to all kinds of matters or things not of the same nature as those already named. Otherwise there would be no sense in the prior enumeration. *Hermance* v. *Supervisors &c.,* 71 N. Y. 481; *People* v. *New York &c. Ry. Co.,* 84 N. Y. 565; *Thames &c. Insurance Company* v. *Hamilton,* 12 App. Cas. 484.

Doubtless the Government is charged with the supervision of the action of all its officials, but that supervision does not of itself create a pecuniary interest. This court has a supervising control of the lower Federal judicial tribunals. We are interested in seeing that full justice is done in all cases therein. But that duty of supervision and review creates no pecuniary interest, and does not disqualify a single one of us from participating in the consideration of this case.

If it be said that the Government is pecuniarily interested in the postage the amount of which might be affected by the issue of a fraud order, it is enough to say that there is no proof of any such interest. Further, postage is received in payment for services rendered in transportation. If no services are rendered no postage is received. The issue of a fraud order does not put a stop to the carrying of letters. It simply stops the delivery. It may be that when knowledge of the issue of a fraud orders becomes widespread, the number of letters may be

diminished, but as heretofore said, diminishing the amount of mail matter diminishes likewise the cost thereof. The Government is no more interested in an increase or diminution of the amounts received by railroad and other carriers for transporting the mails, or those received by stamp contractors for the manufacture of stamps, than it is in the fees received by marshals, clerks, and other officers for services rendered to individuals. In any event, opposing a fraud order would not, in the language of the chairman of the House Committee on the Judiciary, hereinafter quoted, be a suit against the Government.

Again, the history of the passage of the bill which culminated in this statute emphasizes the views already expressed. The bill was introduced into the Senate December 23, 1863, by Senator Wade. As prepared it forbade the appearance of a Senator or member of the House of Representatives in any court as well as Department, etc. On February 10, 1864, the Committee on the Judiciary reported in favor of striking out the following words (p. 555):

"No member of the Senate or of the House of Representatives of the United States shall, during his continuance in office, hereafter appear or act as counsel, attorney, or agent in any cause or proceeding, civil or criminal, in any court, civil, criminal, military, or naval, or before any commission, in which the United States is a party or directly or indirectly interested, or receive any compensation of any kind, directly or indirectly, for services of any description rendered by himself or another in relation to any such cause or proceeding;" and they were stricken out.

On page 561 is this statement by Senator Trumbull, the chairman of the committee:

"This is not a bill to prevent attorneys from practicing in courts of law, but it is a bill to prevent Representatives and Senators in Congress and officers of the Government who are paid for their services from receiving a compensation for advocating claims in the Departments and before the bureaus

of the Government, and before courts-martial. That is the particular question that is pending."

On p. 2773 in the proceedings of the House it appears:

"Mr. Wilson, from the Committee on the Judiciary, reported back Senate bill No. 28, relating to members of Congress, heads of Departments and other officers of the Government. The bill was read. It prescribes penalties for members of Congress, heads of Departments, or other officers engaging as attorneys or counselors in suits against the Government. The bill was ordered to a third reading; and was accordingly read the third time and passed."

While much weight must not be given to the declarations of individual Senators, those which are embodied in the reports of the chairman of the judiciary committees are certainly entitled to consideration, and they show clearly that the intent of Congress in this enactment was to prevent Senators and other officials of the Government from receiving compensation for assisting in the prosecution of claims against the Government. It would be the height of absurdity to suppose anyone believed that a Senator should be debarred from the right of appearing in any court in cases in which the Government is without a pecuniary interest, and yet that was the scope of the bill as originally presented, if the present construction of the statute is sustained.

Further, while it may be true that executive officers are apt to give undue weight to the wishes of Senators, yet there is nothing in this statute to prevent a Senator from exerting all his influence over them. He may prosecute any claims in behalf of his constituents or others, even though the Government is directly and largely pecuniarily interested. He may appear in any matter or proceeding pending before one of the Departments, and there is nothing in the statute to prohibit it. The only restriction is that he must himself have no pecuniary interest in the matter. The denunciation is against his receiving or agreeing to receive compensation for his services. Is it not reasonable to believe that if pecuniary interest on his

part is the only bar to his action a like pecuniary interest on the part of the Government is that interest on the other side intended by the statute?

It is said the language of the section is "directly or indirectly interested," but that does not change the fact that the Government must be interested, and interested, as I have shown, refers to some pecuniary interest. It is directly interested when as the result of the proceeding it may make or lose some of its property, as where a claim is prosecuted in the Department for a tract of land, or for the allowance of a contract to a higher rather than to a lower bidder. It is indirectly interested when the effect of the ruling may result in pecuniary loss to the Government in some other case to be thereafter presented to the Department. It may be that in a pending case the Government is guaranteed against loss, and yet if a certain ruling is established as the ruling of the Department it may affect future cases in which there is no such indemnity to the Government, and in those cases it would be indirectly interested. But whatever the line of demarkation between "direct" and "indirect" results, the statute is clear that the Government must be "interested."

Other matters of moment have been discussed by counsel, but as this is fundamental and upon it rests the whole prosecution, I have preferred to express my views on this matter alone. It seems clear to my mind that the construction now given writes into the statute an offense which Congress never placed there. It is a criminal case, and, in such a case above all, judicial legislation is to be deprecated.

I am authorized to say that MR. JUSTICE WHITE and MR. JUSTICE PECKHAM concur in these views.