**UNITED STATES v. TURLEY et al.**
No. 254.

Circuit Court of Appeals, Second Circuit.
May 19, 1943.

Mathias F. Correa, U. S. Atty., of New York City (Robert Roy Dann and Samuel H. Reis, Asst. U. S. Attys., both of New York City, of counsel), for appellee.

Arthur N. Sager, of New York City, for appellant George A. Turley.

Alex Simpson and Thomas F. Tumulty, both of Jersey City, N. J. (Emanuele Trotta, of New York City, of counsel), for appellant Peter W. Burns.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

George A. Turley, Peter W. Burns and four others were indicted for transporting or causing to be transported in interstate commerce securities theretofore stolen and of a value in excess of $5,000 in violation of 18 U.S.C.A. § 415. The indictment also

contained a count charging conspiracy to violate the above statute contrary to 18 U.S.C.A. § 88. A severance was granted as to one defendant; two others pleaded guilty; and a fourth was convicted with Turley and Burns, but only those two have appealed.

It was discovered sometime in April of 1937 that twenty-five gold notes attached to proofs of claim in the reorganization proceeding of the Minnesota & Ontario Paper Company had been stolen from the files of the United States District Court at Minneapolis, Minn. At the time of the stealing appellant Burns was in the business of obtaining and selling lists of stockholders and was specially interested in lists showing the names of stockholders of companies in the process of reorganization. He operated this business under the name of Bond & Share List Co. at 15 William Street, New York City. Turley, an attorney practicing in New York City, was also interested in obtaining such lists and there was evidence showing that he and Burns had been acquainted since as early as 1935.

Burns and another defendant, Bollenbach, were shown to have been at the United States District Court House in Minneapolis in the latter part of January, 1937; and it was proved that Bollenbach had been there examining the files where the gold notes which were stolen were kept. Burns likewise admitted that he had telephoned Turley in New York while he was en route either to or from Minneapolis; and although he testified that the purpose of his call to Turley was to obtain the address of another Turley in Chicago who dealt in stockholder lists, the jury did not have to believe that but might well have inferred that the conversation was about these gold notes.

Sometime early in February of 1937, Bollenbach returned to New York City, rented an office at 15 East 40th Street under the alias of Berendson, and tried to dispose of ten of the gold notes which had been stolen in Minneapolis. There was evidence that placed Burns in this office at least ten times in the short period Bollenbach used it. Bollenbach's attempt to sell ten of the notes proved unsuccessful when Hart Smith & Co., through whom he tried to make the sale, grew suspicious and stopped payment on its check which had been made out and delivered to Berendson for the bonds and on which there appeared only a typewritten indorsement in that name when Berendson tried to open a checking account by depositing the check in a bank. Thereafter Bollenbach made efforts through another defendant, Jacobson, to effect either the return of the notes or the cashing of the check, but he was unsuccessful.

While these negotiations were going on, Bollenbach, through Turley, disposed of the remaining fifteen notes. This was accomplished with the aid of the defendants Blaser and Ingalls who were called to Turley's office and to whom Turley introduced Bollenbach as "Mr. Brown." At Turley's suggestion a fictitious sale was put through Blaser and Ingalls as though in the regular course of business and made to a "Walter T. Roberts," after which they disposed of the notes through A. E. Ames & Co. on the strength of a letter, brought to them by Bollenbach, which purported to give them authority to make the sale. Blaser than cashed the check of Ames & Co., which was made out to "Roberts," after guaranteeing the indorsement in that name. Ingalls testified that he took the money to Turley's office where some sort of division of it was made. Turley, Burns and Bollenbach were all present. Later, in April of 1937, Turley told Blaser and Ingalls that Burns had stolen the bonds in Minneapolis according to testimony which was admitted against Turley.

There was likewise evidence that Turley and some of the other defendants had been involved in similar transactions for the disposition of securities which had either been stolen or obtained by fraud.

The appellants claim that error was committed in that there was not enough evidence to support the verdict, in that the court committed error in charging the jury, and in that the overt acts alleged and proved left the crime charged still unproved as the statute requires because they occurred after the notes had come to rest in the State of New York and after they had lost their interstate character.

■ We think for the reasons about to be given, that there was enough evidence for the jury to have found as it did that these appellants either transported, or caused to be transported, in interstate commerce securities which were known to them to have been stolen; and we are also satisfied that the jury was justified in finding that they conspired so to do.

■ Burns and Bollenbach were both in Minneapolis in January of 1937, and

Burns admitted that he had been in the court house from which the notes were stolen. Bollenbach was not only seen there, but also had access to the files wherein the notes were kept. That the jury was justified in concluding that they were there to steal the notes if they could and take them to New York is adequately clear. Their continued association after Bollenbach returned to New York and was trying to dispose of the securities tied them well enough together in this business. Burns was not only seen at the office maintained by Bollenbach under the name of Berendson, but he was also seen by Ingalls to have taken some of the proceeds of the sale made through Blaser and Ingalls. This evidence not only supported an inference that Burns conspired to transport the stolen bonds or to cause them to be transported from Minneapolis to New York, but it also justified the conclusion that he participated as a principal in the substantive crime charged. Furthermore, his cooperation in the disposal of the notes tended to show that he acted with a guilty knowledge of the whole transaction from start to finish. United States v. Seeman, 2 Cir., 115 F.2d 371. There was also proof that Burns was in touch with Turley by telephone which well might have been treated as highly indicative of their then participation in the common venture even though Burns explained that his call had another and an innocent purpose. Indeed, the jury might well have inferred that they were participating in the substantive crime charged, as well as the conspiracy. Bearing on this is the corroborative evidence that Turley dealt with the stolen notes after they reached New York; that he had before been engaged in similar transactions with some of the conspirators; one of which involved the stealing of securities by Bollenbach from the United States District Court at Wilmington, Delaware, to be sold in New York; and that he had told Blaser and Ingalls that the notes had been stolen by Burns. United States v. Seeman, supra. The evidence consequently was substantial in support of the verdict as to both Burns and Turley.

■■■ The appellants objected to the charge of the court to the effect that they might be convicted under 18 U.S.C.A. § 415 if they were organized to dispose of stolen securities; were willing so to do; "and cared not where the property came from, either within or without the state * * *"

An exception was taken to this charge although no reason for the exception was given. The theory of such a conviction, as stated in the charge, is "that by furnishing a market for such stolen property he (such person) thereby caused bonds in another state to be transported to New York." Under the circumstances, that was a fair statement of the rule set forth in United States v. Crimmins, 2 Cir., 123 F. 2d 271, 273. There it was pointed out that an agreement to take and dispose of stolen securities, whether or not some of them came from without the state, would support a conviction for conspiracy to transport stolen securities in interstate commerce in violation of § 415, Title 18 U.S.C.A. Relevant to the existence of such an agreement was the evidence of Turley's similar transactions, such as the one in Delaware; that Turley and Burns were in touch with one another by telephone; and that Turley and Burns participated with Bollenbach in the disposal of the notes in New York. The court in substance charged this when it said, "A continued indifference to the source of the bonds, coupled with the knowledge that they had come beyond the State, would be some evidence of such an agreement." It was not error to follow the Crimmins case in this way.

■■■ The appellants also insist that it was erroneous to charge the jury as follows:

"It is not necessary at all for Turley or Jacobson to be out in Minneapolis at all. In saying what I am about to say please do not feel that I am expressing any view held by myself, but I am trying to illustrate to you. Let us say for example Turley agreed to finance Bollenbach and Burns in going out to steal these bonds in Minneapolis, knowing that they were there in the clerk's office. He would be as guilty then if they brought back the bonds to Turley in New York as if Turley was out in Minneapolis, because they would be acting for him in this work.

"It is not for me to say, and I don't mean to indicate, as I said a moment ago, that that was the fact; but you are entitled to take all these circumstances into account in coming to a conclusion whether this is a planned theft or transportation of these bonds."

When one of the attorneys objected to this illustration the court again disclaimed any intent to charge that Turley had, in fact, financed the trip and said, "I don't

say he did." The appellants, however, argue that this was error in that the court charged the jury on facts that did not exist; and it was error, of course, if the court went so far as to usurp the functions of the jury. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321. Nor could the court make deductions or advance theories which were not warranted by the evidence. United States v. Breitling, 20 How. 252, 15 L.Ed. 900. But here the court was not doing that but merely indicating by way of illustration that Turley might be guilty of the substantive crime of causing the transportation of stolen securities in interstate commerce even though he remained in New York. That was, of course, a fair statement of the law. Furthermore, it is a stretch to say that the use of this illustration in connection with a proposition of law was such an unfair comment as to warrant a reversal on the theory that the use of it brought about the conviction of the appellants. See Allis v. United States, 155 U.S. 117, 123, 15 S.Ct. 36, 39 L.Ed. 91; Luteran v. United States, 8 Cir., 93 F.2d 395, 401.

In view of the sufficiency of the evidence to support the verdict as above indicated both as to transportation and conspiracy, it is immaterial when, if ever, the notes ceased to be in interstate commerce before the conspirators disposed of them.

Affirmed.