**EGAN v. UNITED STATES.**

**UNION ELECTRIC CO. OF MISSOURI
v. SAME.**

Nos. 12267, 12268.

Circuit Court of Appeals, Eighth Circuit.

Aug. 9, 1943.

Rehearing Denied Sept. 9, 1943.

Thomas Bond, of St. Louis, Mo., for appellant Louis H. Egan.

Robert J. Keefe, of St. Louis, Mo. (Russell H. Doerner and Igoe, Carroll, Keefe & Coburn, all of St. Louis, Mo., on the brief), for appellant Union Electric Co. of Missouri.

Harry C. Blanton, U. S. Atty., of St. Louis, Mo., and Homer Kripke, Asst. Sol., Securities and Exchange Commission, of Philadelphia, Pa. (James R. Sharp, Sp. Atty., U. S. Department of Justice, of Washington, D. C., and Ervine J. Green, Atty., Securities and Exchange Commission, of Philadelphia, Pa., on the brief), for the United States, appellee in both cases.

Before THOMAS and JOHNSEN, Circuit Judges, and VOGEL, District Judge.

THOMAS, Circuit Judge.

The appellants, Louis H. Egan in No. 12,267, and Union Electric Company of Missouri in No. 12,268, were indicted and tried together. Their separate appeals were presented on a single record and submitted at the same time. It will be convenient to dispose of both appeals in a single opinion.

The appellant Union Electric Company of Missouri, a Missouri corporation, is a public utility holding company within the meaning of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79b. It is also an operating company. In connection with its subsidiaries it is engaged in operating electric public utilities in the states of Missouri, Illinois and Iowa. In carrying on its business it engages in, and controls instrumentalities of, interstate commerce, and it uses the mails. This corporate appellant and its subsidiaries are subsidiaries of the North American Company, a New Jersey corporation, registered as a holding company under the Act on February 25, 1937. The appellant Egan was president of the appellant Union Electric Company and of each of its several subsidiaries.

The indictment is in eight counts. Count 1 charges the appellants, hereinafter called defendants, together with Frank J. Boehm and Albert C. Laun (neither of whom was indicted), and "other persons to the Grand Jurors unknown" with conspiracy (18 U.S.C.A. § 88) to violate § 12(h) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79l(h). Counts 2 to 8 inclusive charge substantive offenses in violation of § 12(h). Egan was found guilty and sentenced under Count 1, and not guilty under Counts 2 through 8. Union Electric was found guilty and sentenced under each and all counts of the indictment.

The parties filed separate motions for mistrial, for directed verdicts and for new trials in the district court, all of which were overruled. On these appeals both parties contend (1) that § 12(h) of the Act is unconstitutional, and (2) that the trial court erred (a) in refusing to direct verdicts of acquittal, (b) in the admis-

sion and exclusion of evidence, and (c) in the refusal and the giving of instructions.

Section 12(h) of the Public Utility Holding Company Act of 1935 reads:

"It shall be unlawful for any registered holding company, or any subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, directly or indirectly—

"(1) to make any contribution whatsoever in connection with the candidacy, nomination, election or appointment of any person for or to any office or position in the Government of the United States, a State, or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing; or

"(2) to make any contribution to or in support of any political party or any committee or agency thereof.

"The term 'contribution' as used in this subsection includes any gift, subscription, loan, advance, or deposit of money or anything of value, and includes any contract, agreement, or promise, whether or not legally enforceable, to make a contribution."

1. *Constitutionality of § 12(h).*—The defendants do not deny that Congress may by appropriate legislation prohibit contributions to candidates for federal offices; but they contend that it is beyond the power of Congress to prohibit contributions by public utility holding companies, registered under the Act, to political parties or to candidates for nonfederal offices; that the invalid provisions of § 12(h) applicable to nonfederal candidates cannot be separated from the provisions applicable to federal candidates without destroying the whole purpose and aim of the Act, and that, therefore, all the prohibitions against political contributions are invalid. If the provisions of the section applicable to candidates for nonfederal offices are found to be valid it will be unnecessary to discuss the separability of the section.

The defendants say the provisions of § 12(h) are beyond the powers of Congress because political contributions are not commerce; that they are not per se evil; that they have no relation to the carriage of the mails; that they have no substantial effect upon interstate commerce; that the prohibitions are invalid because they apply to all political contributions regardless of size or whether they have any effect upon interstate commerce; that § 12(h) is an attempt by Congress to regulate state elections and that by prohibiting contributions "otherwise" than by use of the mails or instrumentalities of interstate commerce the statute covers campaign contributions however or wherever made to nonfederal candidates; and that Congress made no finding that contributions made "otherwise" have any relation to interstate commerce.

In the case of Electric Bond & Share Co. v. Comm., 303 U.S. 419, 58 S.Ct. 678, 681, 82 L.Ed. 932, 115 A.L.R. 105, the Supreme Court held that §§ 4(a) and 5 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79d(a), 79e, are valid constitutional regulations. The Court there held that a public utility holding company system carrying on operations in two or more states, transmitting energy across state lines for its own account and for sale, and distributing its securities to the public, is engaged in activities which bring it "within the ambit of congressional authority." The Court also held that the "various groups of regulations [contained in the Act], as well as particular provisions of each group should be regarded as separable so that, if any such group or provision should be found to be invalid, that invalidity should not extend to the remaining parts if by reason of their nature and as a practical matter they could be separately sustained and enforced." It is necessary, therefore, to consider the question of the validity of § 12(h).

The proposition that political contributions are not commerce and are not subject to regulation by Congress is not a valid objection to the Act. The commerce power extends to every activity, intrastate or interstate, which so affects interstate commerce, or the exercise of power over it, as to make regulation of such activity an "appropriate means to the attainment of a legitimate end." United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726. The only question in such a case is whether the means adopted are appropriate to the attainment of the end. Congress having decided upon a legitimate end to be attained and a policy adapted to its attainment may choose the means for its accomplishment. Wickard v. Filburn, 317 U.S. 111, 124, 63 S.Ct. 82, 87 L.Ed. ——; United States v. Darby, 312 U.S. 100, 118 et seq., 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v.

Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208; Mulford v. Smith, 307 U.S. 38, 48, 59 S.Ct. 648, 83 L.Ed. 1092; Virginian R. Co. v. System Federation, 300 U.S. 515, 553, 57 S.Ct. 592, 81 L.Ed. 789; Electric Bond & Share Co. v. Comm., supra. Here the prohibitions of § 12(h) are a means only adopted by Congress for attaining an end considered legitimate, namely, the effective exercise of the power to regulate interstate commerce.

■ The arguments that political contributions are not per se evil; that § 12(h) fails to distinguish between trivial and large contributions; and that it is an attempt to regulate state and local elections are all without weight. It is axiomatic that an innocent means may be used for an evil purpose. The fact that a contribution may be trivial is not enough to remove the contributor from the scope of federal regulation when the sum of all such contributions may be far from trivial. Wickard v. Filburn, 317 U.S. 111, 127, 128, 63 S.Ct. 82, 87 L.Ed. ——. The prohibitions of § 12(h) do not, and clearly are not intended to, interfere with voting or with control over the state's regulation of elections.

■ The contention that political contributions do not affect rates to consumers and, therefore, do not affect interstate commerce is equally without merit. If such contributions are considered as costs of operation, or if they are disguised on the books of the utility company as operating costs, they will affect rates. In this connection it is argued that the evidence shows that contributions and use of the company's money were favorable to the interest of consumers for the reason that by this means bills disadvantageous to the utility were defeated in the Missouri legislature and bills advantageous to its interests were passed, resulting in a saving to the company of approximately two and one-half millions of dollars annually. It is for the Congress, however, and not the courts, to estimate whether the influencing of legislatures by means of contributions to candidates for office is harmful to the public interest, even though admittedly beneficial to an individual or a class.

Whether the jury might have found the particular defendants in this case guilty, or not guilty, the evidence is abundantly sufficient to support a finding that contributions by interstate public utility holding companies "in connection with the candidacy, nomination, election or appointment of any person for or to any office or position in * * * a State or any political subdivision of a State * * * or * * * to or in support of any political party or any committee or agency thereof" are an evil, and that such practices "are not susceptible of effective control by any State * * * *". Section 1 of the Act, 15 U.S.C.A. § 79a. The evidence shows that the defendant Union Electric is a Missouri corporation; that its officers in violation of the statutes of Missouri, R.S. Mo.1929, § 10478, R.S.Mo.1939, § 11786, Mo.R.S.A., contributed many thousands of dollars to candidates in Missouri for governors of the State, for members of the legislature, and for members of county boards whose duty it is to determine the taxable value of property; and that such contributions were made for the purpose of influencing the official acts of such officers. The state of Missouri seemed powerless to prevent these violations of its laws. Since Union Electric by reason of its interstate business and its use of the mails was subject to the control of Congress, Congress was entitled to find that such practices were injurious to the citizens, to consider and estimate the evil, and to choose and prescribe a remedy therefor. Electric Bond & Share Co. v. Comm., supra.

■ The defendants urge that the Act fails because Congress made no specific finding that political contributions made "otherwise" than by mail or by means or instrumentalities of interstate commerce in connection with candidacies for nonfederal offices have any relation to interstate commerce. The necessity for such specific finding is eliminated by the statutory scheme itself. Compare North American Co. v. Securities and Exchange Comm., 2 Cir., 133 F.2d 148, 153. Section 1 of the Act declares that public utility holding companies and their subsidiaries are affected with a national public interest in that their securities are marketed in interstate commerce and that their activities are not susceptible of effective control by state regulation. Section 1(c) declares that it is the policy of the Act to eliminate certain evils "connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce." It is further declared that when in any respect there is lack of economy of management and operation of such companies they be--

come an agency which, unless regulated, is injurious to investors and consumers. It follows, therefore, that when Congress denounced political contributions in § 12(h) of the Act in connection with both federal and nonfederal candidacies it necessarily found that all such contributions constitute such a lack of economy in management and operation as directly to affect or burden interstate commerce.

Further, § 12(h) is of itself evidence of the Congressional judgment that political contributions by a registered public utility holding company have a relation to the public interest as defined by § 1(a) of the Act, and that the effect of such contributions constitutes one of the evils sought to be eliminated by the Act. This court cannot say that such Congressional judgment is without rational basis. United States v. Lowden, supra. A legislative judgment is presumed to be supported by facts known to the legislature, unless facts judicially known or proved preclude that possibility. South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 191, 625, 58 S.Ct. 510, 82 L.Ed. 734; and compare United States v. Darby, supra; United States v. Ferger, 250 U.S. 199, 39 S.Ct. 445, 63 L.Ed. 936; Virginian R. Co. v. System Federation, supra; State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878.

Another charge is that the prohibitions of § 12(h) have no relation to the carriage of the mails, but are an attempt to regulate the users of the mails. It is well settled, however, that when Congress in the exercise of its constitutional powers prescribes a valid regulation pertinent to the use of the mails, it may withdraw the privilege of that use from those who disobey. Electric Bond & Share Co. v. Comm., supra; Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190; Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706; Ex parte Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93.

Considering the evil effect of political contributions, as determined by Congress, and sought to be eliminated by means of § 12(h) of the Act, we think the prohibition of such contributions, whether made to candidates for federal or nonfederal offices, whether to national or local parties or committees, or whether by use of the mails or by means or instrumentalities of interstate commerce, "or otherwise", by public utility holding companies, is within the power of Congress.

We conclude that § 12(h) of the Act is a valid exercise by Congress of its constitutional power.

2. *Defendants' Motions for Directed Verdicts.*—The defendant Egan moved for a directed verdict on the ground that the evidence was insufficient to sustain a verdict, in that there was no competent or admissible evidence to establish that he conspired or participated in any conspiracy to make political contributions in violation of § 12(h) of the Act.

The defendant Union Electric Company moved for a directed verdict and requested that the jury be charged to return a verdict in its favor on the ground that the evidence failed to show that the acts of its officers in making political contributions were expressly authorized by its board of directors or that a majority of its members, having prior actual knowledge of the fact that such acts were in contemplation, failed to object thereto.

The defendants do not deny in this court that officers and employees of the defendant Union Electric Company did participate in the conspiracy charged and that they did commit the acts charged in the substantive counts of the indictment.

The indictment alleged that the conspiracy existed continuously from "on or about the 25th day of February, 1937 [the day on which the parent holding company, North American Company, registered under the Act], to and including the date of the return of this indictment", January 17, 1941. More specifically the charges were that the conspirators agreed that they would create a secret cash fund of money belonging to Union Electric, for use in making political contributions, by means of cash rebates from attorneys employed by Union Electric and its subsidiaries, cash rebates from contractors, suppliers of materials and insurance brokers, and cash refunds derived from padded expense accounts of officers and employees of the company and its subsidiaries; and that they did raise such fund in the manner charged and did make from it political contributions on behalf of the company and its subsidiaries in violation of § 12(h) of the Act.

After verdicts of guilty have been returned by the jury we are required, on appeal from orders overruling motions by defendants for directed verdicts, in re-

viewing the evidence to consider the testimony in its aspect most favorable to the government, and we may not weigh the facts or determine the guilt or innocence of the accused. Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362; Walker v. United States, 8 Cir., 93 F.2d 383, 392, certiorari denied, 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103; Firotto v. United States, 8 Cir., 124 F.2d 532, 533; Culp v. United States, 8 Cir., 131 F.2d 93, 100. It is immaterial that the evidence is conflicting and that Egan and other witnesses for defendants denied much of the testimony produced by the government. United States v. Kushner, 2 Cir., 135 F.2d 668, 673.

In general the government's evidence tended to support the allegations of the indictment. Charges that the defendant Union Electric was engaged in the practice of making political contributions in violation of § 12(h) first appeared in a St. Louis newspaper about November 1, 1938. Following the publication of these charges investigations were carried on by the Securities and Exchange Commission pursuant to its orders dated November 9, 1938, and June 7, 1939. On January 3, 1940, Spoehrer, secretary and director of the company, furnished the Commission an affidavit containing an admission of his participation in the raising of the secret fund and implicating other officers of the company. Officers and employees of the defendant company appeared before an examiner for the Commission and denied the charges. Some of the officers of the company were indicted and convicted of perjury for giving false testimony in the investigation. One of the vice-presidents appealed to this court and his conviction was affirmed. Boehm v. United States, 8 Cir., 123 F.2d 791, certiorari denied, 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1200. Many of the facts in evidence in this case are recited in our opinion in that case, and they will not be repeated here further than is necessary to an understanding of the legal questions presented.

The plan to create a secret fund for use in making contributions to candidates for office and to political party committees by means of rebates and false expense accounts originated in 1926. In that year the subject was suggested to Boehm, executive vice-president of Union Electric, by a Mr. Gruhl, then president of the parent holding company, the North American Company.

The plan was developed and put in operation, and in 1932 the sum of $15,000 was contributed to the Republican national committee. The system continued in existence and operation until sometime in 1939 or 1940. During the period of its operation a fund of more than $591,000 was created by means of rebates and false expense accounts and expended through Boehm's office for political purposes in the interest of and for the benefit of Union Electric and its subsidiaries. It was distributed directly and indirectly to candidates for public office, to public officials, and to party committees in the states of Missouri, Illinois and Iowa by means of the mails, by the instrumentalities of interstate commerce and by delivery in person in the state of Missouri. The recipients included candidates for both federal and nonfederal offices, federal and nonfederal officials, and both national and local party committees. Little, if any, party bias was shown in distributing these favors. Democrats and Republicans alike were among the beneficiaries. Many of the recipients testified at the trial.

The fund was distributed principally by Boehm and Laun, a director and vice-president of the company. Other officers of Union Electric, including Egan, connected with the operation of the system were Spoehrer, director and secretary; Funk, vice-president; Miltenberger, vice-president; Irish, research engineer; Emberson, operating auditor; Avery, director and general auditor; and certain officers of the subsidiaries. The amounts expended ran as high as $75,000 a year. None of the transactions connected with the fund was recorded in the books of the company.

The contention of Egan that there is no evidence of any conspiracy to make campaign contributions by use of the mails or any means or instrumentality of interstate commerce exclusively need not be considered since we hold that § 12(h) is valid as written including the "otherwise" clause. The important contention of Egan is that there is no evidence warranting a finding that he was one of the conspirators or that he participated in its operations. The evidence relied upon by the government is circumstantial in character. One phase of the testimony is in substance that Egan had knowledge of the plan and of the activities of his subordinate officers in the operation and furtherance of the plan from its beginning in 1926 until sometime in 1939, and

that he was continually informed of those activities and approved them. The evidence also tends to show that the whole subject of political expenditures was distasteful to him and that his preference would have been to have nothing to do with such matters.

Some of the particular circumstances relied upon to connect Egan with the political activities of Boehm, Laun and other officers and employees of Union Electric will be noticed. They are too numerous to be recited inclusively.

Egan participated in a conference in 1932 in which president Gruhl of the North American Company directed him and Boehm to make political contributions for the reason that Missouri public utility companies were in disfavor with the Missouri legislature because their officers kept aloof from politics. He was present in 1937 when North American officials approved the use of expense account padding as a means of raising a secret fund for political purposes. He took an active interest in maintaining Laun at the capital of Missouri as a lobbyist for the company when the legislature was in session, knowing that it was "expensive" to do so.

Egan presided at two meetings of public utility executives in 1934, at which Boehm proposed a plan for offering systematic financial support to candidates for office throughout the state of Missouri and for distributing the burden among the Missouri public utilities on an "equitable" basis. The purpose of the plan on the part of Boehm was to spread the cost and thus relieve Union Electric of some of the burden which it had been carrying alone.

In 1936 and 1938 Boehm and his secretary turned over to Egan $4,500 of the secret fund; but the testimony does not disclose what use, if any, was made of this sum.

Egan took an active interest in the investigations of the Securities and Exchange Commission in 1938. In October of that year Laun, already accused and under suspicion, asked Egan whether Union Electric and North American were going to stand back of him. Egan's reply was that Laun "talked like a damned fool and that, of course, they were going to stand back of him." When in January, 1940, Miltenberger told Egan that he "was having some difficulty in statements that I [he] had made to the Securities and Exchange Commission", Egan told him to "sit tight and the

thing would probably straighten itself out." On January 7, 1940, Spoehrer's attorney read the affidavit which he had furnished the Securities and Exchange Commission in the presence of Egan, Boehm, Laun and Lincoln, an attorney for Union Electric. One paragraph of the affidavit implicated Egan in the activities of the conspirators, and he did not protest.

As showing Egan's connection with and direct participation in the conspiracy the government relies also upon the circumstances connected with a $1500 a year salary paid Egan by the Union Colliery Company, a subsidiary of Union Electric, from 1926 to 1938, and contributions made by Egan to the Republican national committee during that period. In substance the testimony is to the effect that in 1926 Egan requested of the president of North American an increase in salary to enable him to make political contributions in behalf of the company without disclosing such items on his expense account. A transcript of Egan's testimony given September 4, 1940, before a grand jury at Springfield, Illinois, was produced. The transcript disclosed that Egan was asked at that time if he had any arrangement with the president of the North American Company. He answered: "On one occasion I was talking to him about the fact that occasionally I was solicited as president of the company for contributions from Democratic and Republican Committees", and that the president said, "We will have you put on the Colliery Company pay-roll at $1,500 a year." Egan continued: "That didn't mean I got that much a year, because about half of it went to income tax and that the balance was given to me for that purpose, and that was what it was used for." The testimony shows that Egan contributed to the Republican finance committee $500 on September 25, 1936, $500 on October 9, 1936, and $250 on March 10, 1938.

The first question presented on this record relates to the effect of Egan's knowledge of the conspiracy and of the activities of the conspirators, with his approval, in the furtherance of its purpose and object. Does such evidence support the charge and the finding of participation?

Upon this point Egan's contention is that "mere knowledge, presence, acquiescence or approval of the unlawful acts of others is not enough"; that proof of "intentional participation must also be shown." In sup-

port of this proposition he relies upon United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; Weniger v. United States, 9 Cir., 47 F.2d 692; United States v. Potash, 2 Cir., 118 F.2d 54; Patterson v. United States, 6 Cir., 222 F. 599; Linde v. United States, 8 Cir., 13 F.2d 59, and similar cases.

 These cases support Egan's contention, but none of them holds that proof of knowledge has no relevancy in a conspiracy trial. The gist of the offense of conspiracy under the federal statute (18 U.S.C.A. § 88) is an agreement among the conspirators to commit an act prohibited by an Act of Congress in the interest of the public policy of the United States, and an act by one or more of the conspirators to effect the object of the conspiracy. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. ——; United States v. Falcone, supra; Fulbright v. United States, 8 Cir., 91 F.2d 210. Certainly such proof is relevant to knowledge of the existence of the agreement and to an intent to participate in carrying it out. Egan was president and a member of the board of directors of the defendant Union Electric and its subsidiaries. If the jury believed the testimony of Boehm and others it was warranted in finding that Egan was familiar with the purpose and design and with the activities of the conspirators from 1926 on. He was in accord with the object of the conspirators, which was to influence legislation, to reduce taxes, and to oppose public ownership of utilities. He knew and approved the acts of his subordinate officers in secretly creating a cash fund out of the moneys of the companies of which he was president; he knew and approved the false bookkeeping necessary to conceal the origin and use of the fund; and he knew and approved contributions from the fund to candidates for public office and to political party committees. He knew that such contributions by his corporations were in violation of the statutes of Missouri, and after February 25, 1937, the registration date of the parent holding company North American, he knew they were in violation of § 12 (h) of the Act. Further, he knew when he was given an additional salary of $1500 a year, payable by the Union Colliery, a subsidiary of the Union Electric, that it was for the purpose of enabling him to make political contributions for the benefit of the company. The jury was authorized to believe that his subsequent contributions to the Republican national committee were made from this salary.

 The line that separates mere knowledge of and acquiescence in a conspiracy from participation and active cooperation is often vague and difficult to determine. But when, upon competent evidence, a jury finds that a defendant has crossed that line he may be found guilty as a conspirator. Where the accused is not in some beneficial, responsible or interested relation to the conspirators and their activities, and where the activities of the conspirators consist of a single or but a few transactions, mere knowledge, acquiescence and indifference will be insufficient, in the absence of some word or deed, to connect him with the conspiracy. Authorities relied upon by Egan, supra. On the other hand, if the accused has a legal responsibility in the premises, if he has some interest in the success of the conspirators in the accomplishment of their design, if the conspirators inform him of their plan and keep him advised of the steps taken by them to attain their purpose, and he by his approval stimulates their activities, if he also knows that such activities are illegal, and if such activities are so numerous as to constitute a course of business, or are so related as to constitute a system of unlawful conduct continuing over a long period of time, then a jury upon evidence of such facts would be warranted in finding him guilty. Upon such evidence he may be found to be a party to the agreement and a participant in the conspiracy. See Direct Sales Company, Inc., v. United States, U.S., 63 S.Ct. 1265, 87 L.Ed. ——; Alexander v. United States, 8 Cir., 95 F.2d 873, 878; United States v. Turley, 2 Cir., 135 F.2d 867, 869.

 We think the evidence clearly sufficient to sustain the verdict of the jury that Egan participated in the conspiracy. The court did not err in overruling his motion for a directed verdict.

The defendant Union Electric Company by motion for directed verdict of acquittal, by requested instructions, and by exceptions to the charge given by the court to the jury raised the question of its criminal corporate responsibility. The gist of the contention is that the evidence is insufficient to warrant a finding by the jury that the acts of its officers in making the political contributions prohibited by § 12(h) were authorized by the corporation either by an express or an

implied act of the board of directors; and that since such contributions by the corporation were unlawful under both the Missouri statutes and § 12(h), the acts of the officers were ultra vires and the corporation cannot be found guilty in the absence of such approval by the board.

Upon this point the gist of the charge to the jury reads:

"Defendant, Union Electric Company of Missouri, contends that if contributions were in fact made, as alleged in the indictment, such contributions were the individual acts of various officers of the defendant corporation and were not its acts, binding upon it.

"A corporation can act only through its officers and agents and a corporation is held responsible for acts not within the officers' or agents' corporate powers, strictly construed, but which the officer or agent has assumed to perform for the corporation when employing the corporate powers actually authorized, and in such cases there need be no written authority under seal or vote of the corporation, in order to constitute the agency, or to authorize the acts. Therefore, the knowledge, intent and acts of such officers or agents of a corporation may be imputed to the corporation for which they acted. * * *

\* \* \* \* \*

"Hence, if you find from the evidence that the contributions described in Counts 2 to 8, inclusive, were made by either Egan, Boehm, or Laun, in the manner described in said counts, and if you further find that in making such contributions they were acting as officers of the defendant, Union Electric Company of Missouri, and that such contributions were so made on behalf of, or for the benefit of, the defendant, Union Electric Company of Missouri, then it would be your duty to find the defendant, Union Electric Company of Missouri, guilty.

"Likewise, the defendant, Union Electric Company of Missouri, is a party to and guilty of the conspiracy charged in the first count, if you find from the evidence that such a conspiracy existed, and that the defendant, Egan, or Frank J. Boehm, or Albert C. Laun, acting as officers or agents of the defendant, Union Electric Company, joined in such conspiracy on behalf of, or for the benefit of, the corporate defendant."

This instruction is manifestly based upon the opinion of the Supreme Court in New York Cent. & H. R. R. v. United States, 212 U.S. 481, 29 S.Ct. 304, 306, 53 L.Ed. 613. That was a criminal case; and after stating that a corporation may be held responsible in tort for the acts of its agents done in the course of their employment, "although done wantonly or recklessly or against the express orders of the principal", the Court said: "A corporation is held responsible for acts not within the agent's corporate powers strictly construed, but which the agent has assumed to perform for the corporation when employing the corporate powers actually authorized, and in such cases there need be no written authority under seal or vote of the corporation in order to constitute the agency or to authorize the act."

■■■ The test of corporate responsibility for the acts of its officers and agents, whether such acts be criminal or tortious, is whether the agent or officer in doing the thing complained of was engaged in "employing the corporate powers actually authorized" for the benefit of the corporation "while acting within the scope of his employment in the business of the principal." If the act was so done it will be imputed to the corporation whether covered by the agent or officer's instructions, whether contrary to his instructions, and whether lawful or unlawful. Such acts under such circumstances are not ultra vires even though unlawful. There is no longer any distinction in essence between the civil and criminal liability of corporations, based upon the element of intent or wrongful purpose. Malfeasance of their agents is not ultra vires. Washington Gas Light Co. v. Lansden, 172 U.S. 534, 19 S.Ct. 296, 43 L.Ed. 543; New York Cent. & H. R. R. Co. v. United States, supra; Joplin Mercantile Co. v. United States, 8 Cir., 213 F. 926, 935, 936, Ann.Cas. 1916, 470; United States v. Nearing, D.C.N.Y., 252 F. 223, 231; Mininsohn v. United States, 3 Cir., 101 F.2d 477, 478; Zito v. United States, 7 Cir., 64 F.2d 772, 775. The court is not concerned with whether political contributions were authorized by a resolution of the board of directors or acquiesced in by a majority of the board. Our inquiry concerns only the powers of the corporation, the business it was authorized to carry on in the exercise of those powers, and whether the officers of the company in making political contributions were engaged in carrying on that business within the scope of their official duties.

The Union Electric Company's articles of incorporation and its by-laws are in evidence. Its operations and the operations of its subsidiaries are carried on in the states of Missouri, Illinois and Iowa, in which states it owns many millions of dollars worth of property. Its business is subject to regulation by the legislatures of the states in which it operates and the regulatory bodies created by law in those states. It pays approximately 4,000 tax bills annually for taxes imposed by states and by subdivisions of states. As an incident of ownership it has the power to protect its property and to use all lawful means to protect and promote its business. The evidence shows that the corporation in the exercise of this power regards its public relations and its good will as matters of great importance. It has a right to do so and it does send its officers to appear before legislative committees to influence those legislatures and to persuade them to pass laws advantageous to the company's interest and to reject proposed laws inimical to its interest. In the exercise of its powers, it has a right to do so and it does send its officers to state capitals to influence the individual members of the legislatures to be friendly to its interests. It sends its officers to appear before state and municipal boards and officers having power to impose taxes upon its property for the purpose of presenting arguments and data in its interest. To cultivate and develop the friendship of its patrons, prospective patrons, legislators and taxing authorities the company gives entertainments for invited guests including legislators, members of tax boards, patrons and others whose friendship it deems important. It maintains a "lodge" at the lake above its dam in the Ozark Mountains to which it invites for free entertainment state officers and candidates for office. It keeps an airplane to carry such guests from their homes to the "lodge". These authorized public relations activities are within the defendant corporation's powers.

All these "public relations" activities were entrusted principally to president Egan and vice-presidents Boehm and Laun. These gentlemen appeared before legislative committees and taxing authorities at various times. In their zeal to protect the company's property, to promote its business, to cultivate the friendly attitude of patrons and public officials, and to render legislators and taxing boards and commissions susceptible to friendly argument and persuasion, these and other officers who assisted them formed and carried out the plan to raise a secret fund belonging to the company to be used in part at least for contributions to candidates for office and to party committees. The plan so formed was consummated. It was designed for the benefit of the corporation, and the corporation received the benefit. The testimony indicates that the Union Electric Company, as a result of the combined influence upon legislation of contributions to candidates for office and the other activities mentioned above, benefited to the extent of more than two million dollars annually.

 There was abundant evidence to authorize the jury to find that Union Electric's officers in making political contributions were engaged in the business of the company, "employing the corporate powers actually authorized" for the benefit of the company, while acting, although illegally, within the scope of their employment.

The trial court correctly submitted the question of the defendant's corporate responsibility to the jury, and this court cannot set aside the jury's verdict.

3. *Admission of Evidence.*—The trial of the case in the district court lasted approximately one and one-half months, and the record is voluminous. Numerous objections were interposed to evidence offered by the government and received by the court. We shall first consider Egan's objections to such evidence.

The district attorney offered and read in evidence the paragraph of Spoehrer's affidavit implicating Egan in the conspiracy. Counsel for Egan objected to its admission on the grounds (1) that the portion of the affidavit read contains a conclusion of Spoehrer bearing upon the guilt or innocence of Egan and (2) that the date of the meeting at which it was read occurred after the activities of the conspirators had ended, or at least after Egan was no longer in a position to continue any such activities. The government contends that the statement itself and evidence of the circumstances under which it was read to Egan and his failure to comment upon it are admissible as evidence of his acquiescence in its truth.

 The general rule is that "when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement

is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth", 20 Am.Jur. p. 483, if made "under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth." Sparf and Hansen v. United States, 156 U.S. 51, 56, 715, 15 S.Ct. 273, 39 L.Ed. 343; Graham v. United States, 8 Cir., 15 F.2d 740, 743; 4 Wigmore on Evidence, 3d Ed., § 1071; 2 Wharton's Criminal Evidence, 13th Ed., § 698; 31 C.J.S. Evidence, § 294, p. 1057 et seq.

■ The circumstances connected with the reading of the affidavit in Egan's presence are not in dispute. The investigation by the Securities and Exchange Commission of the charge that Union Electric had made political contributions in violation of § 12(h) was in progress. Spoehrer, secretary and director of the corporation, had just returned from Washington where he had given the members of the Commission his affidavit containing a confession. He was the first officer of the company to admit the truth of any part of the charges against it. Until then all the officers had denied them. On Sunday morning, January 7, 1940, a special conference was held in Egan's office. Present were Egan, Boehm, Laun, Lincoln and Spoehrer's attorney, who read Spoehrer's affidavit containing the paragraph implicating Egan. Prior to the conference a copy of the entire affidavit had been furnished to Egan. The paragraph objected to stated that soon after the inquiry by "S.E.C." was announced, "In my conversation with Mr. Egan, I verified the fact that Mr. Egan knew about these transactions [secret rebates] and that he understood that I was merely acting as an agent for the Company and that the Company would stand back of me." When this was read Egan was silent. It was an important moment in the progress of the investigation, and a reasonable inference was that he would, under the circumstances, naturally contradict the statement if he did not consent to it. Boehm and Laun, who at that time had denied the charge, were present. Lincoln, employed as attorney for the company in connection with the investigation, was present. The situation seemed to call for a denial then. We think the evidence was admissible.

■ Objection is taken to the testimony of Mortimer, an officer of North American, the parent holding company. Mortimer in a conversation with Boehm requested Boehm to indicate on a schedule of the officers' expense accounts those which had been inflated. In reference to Egan's account which had been checked as inflated Boehm said: "There is very little in the way of inflations concerning which I have any knowledge. I think he is taking care of some Americanization Program that he apparently did not want to have disclosed on a company voucher." No objection was made at the time the testimony was offered, but Egan had a general objection allowed by the court to stand to all hearsay testimony. This was clearly irrelevant and immaterial evidence as against Egan, but it shows on its face that it was not prejudicial. The inflation of Egan's account was not claimed to be for the purpose of contributing to the fund for political contributions but for another distinct purpose. The statement was favorable rather than prejudicial to Egan, for in effect it negatived the idea that he padded his expense account for the purpose of augmenting the conspiracy fund.

■ Numerous other complaints of the admission of evidence are made by Egan. We have examined each one of them with care and find no reversible error. The complaints, considering their nature, are too numerous to be discussed separately without extending this opinion beyond any reasonable length. The objections are on the grounds that the evidence offered is hearsay, that the facts testified to are collateral or too remote, that the particular circumstance fails to show Egan's connection with the conspiracy, or that the evidence is irrelevant or immaterial, and similar grounds. It must be kept in mind, however, that Egan was convicted for conspiracy and not for the direct violation of § 12(h) of the Act. The indictment charged a conspiracy not barred by the statute of limitations. The evidence tended to show that the conspiracy was on foot long before February 25, 1937, the date on which the Act became applicable to the defendant corporation, and it continued after that date. In law the conspiracy was entered into on the date the parent holding company, North American registered under the Act. Farmer v. United States, 2 Cir., 223 F. 903, 909. It was permissible, however, to prove the acts of the earlier dates. They tended to show

the existence of the conspiracy and the intent of the conspirators. Egan was there during the entire period, but the date of his becoming a party to the conspiracy was uncertain. "The longer it had lasted the greater the probability that he knew of it, and that his acts that helped it were done with knowledge of their effect." Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 229, 57 L.Ed. 450.

■ Assuming that some of the evidence was relevant only to issues other than Egan's participation in the conspiracy or only in respect of Union Electric, as Egan sought to exclude it generally and without requesting a limiting instruction, there could be no error in its admission. Greater New York Live Poultry C. of C. v. United States, 2 Cir., 47 F.2d 156, 159, certiorari denied 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448; American Medical Ass'n v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233, 251 (affirmed on other grounds, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. ——). See and compare, also, Allen v. United States, 7 Cir., 4 F.2d 688; Nyquist v. United States, 6 Cir., 2 F.2d 504, certiorari denied, 267 U.S. 606, 45 S.Ct. 508, 69 L.Ed. 810.

■ "Wide latitude is allowed in the presentation of evidence as to the facts and circumstances in a conspiracy case." Garrison v. United States, 5 Cir., 135 F.2d 877, 878. See, also, Hartzell v. United States, 8 Cir., 72 F.2d 569, 584, certiorari denied 293 U.S. 621, 55 S.Ct. 216, 79 L. Ed. 708. It is "within the discretion of the trial court to admit evidence which even remotely tended to establish the conspiracy charged." Devoe v. United States, 8 Cir., 103 F.2d 584, 588, 589, certiorari denied 309 U.S. 571, 60 S.Ct. 84, 84 L.Ed. 479. In view of the length of the trial in this case and the volume of evidence, the language of the Ninth Circuit Court of Appeals in Simons v. United States, 119 F.2d 539, 559, certiorari denied 314 U.S. 616, 62 S.Ct. 78, 86 L.Ed. 496, is peculiarly apt. The situation in that case was comparable to the situation presented here, and there the court said: "It would not be surprising if there had crept into the trial certain phases of immaterial evidence. * * * we have carefully gone over the entire case and we are constrained to say that while some extraneous matter has found its way into the evidence even against the high vigilance of appellants' counsel we cannot say but that the Court studiously saw to it that the whole story that made up the case was allowed to be intelligently narrated to the jury. * * * In such circumstance a new trial should not lightly be ordered on grounds of technical errors in ruling on the admissibility of evidence."

In our opinion the trial court did not exceed its discretion in overruling Egan's objections to the admission of evidence.

■ The defendant Union Electric complains of two rulings of the trial court on the admission of evidence. The first relates to a legal memorandum prepared by an attorney employed by the corporation in May, 1935, at the request of vice-president Laun. Referring to a Missouri statute, the opinion reads: "You will note that Sec. 10478 expressly prohibits campaign contributions by corporations to any political party or candidate for office. This, doubtless, explains why campaign contributions are made by or in the name of individuals." This was objected to on the ground that it was irrelevant, immaterial and not binding on the company. Since Laun was a vice-president of the company this evidence was pertinent to the question whether there was a probability that the corporation did make political contributions through its officers after February 25, 1937. The effect of all such evidence was limited by the instructions of the court to this one purpose. It was admissible.

■ Union Electric's second assignment refers to an answer of Boehm to a question by the district attorney. Referring to the funds accumulated from rebates and padded expense accounts handled through Boehm's office, he was asked, "In whose behalf * * * were these funds disbursed?" Over the objection that the question called for the mere conclusion of the witness, Boehm answered, "On behalf of the Union Electric Company." The fund was handled by Boehm and the answer stated what Boehm regarded as a fact within his own knowledge. There is no complaint that counsel was denied the right to cross-examine. There was no error in the ruling of the court.

4. *The Instructions to the Jury.*—Both defendants requested instructions to the jury and have taken exceptions to the court's refusals and to the charge given. Egan requested the court to instruct the jury "that if you believe and find from

the evidence that the contributions or donations made by defendant Louis H. Egan to the Republican National Committee, if any, referred to in the evidence, were made from his personal funds and that he was not reimbursed by any registered holding company or subsidiary thereof, then you are instructed that such contributions or donations, if any, are lawful and do not constitute any offense against the laws of the United States."

■ One of the overt acts listed in the conspiracy count of the indictment was that "On or about March 4, 1938, the defendant Louis H. Egan at St. Louis, Missouri, gave a check to one Edmund Koeln for political purposes." There was evidence tending to show that this was a donation to the Republican national committee. There was evidence, also, that Egan had received $1,500 a year from 1926 until 1938 under the guise of a salary from the Union Colliery Company, a subsidiary of Union Electric and the North American Company, for the purpose of making political contributions for the benefit of the parent holding companies. Egan testified that the contribution was made from his own money. He was not convicted for the substantive offense of making contributions to a political party or committee in violation of § 12 (h) of the Act. The evidence in reference to the Colliery Company salary and his contributions to the party committee was offered and received on the issue of Egan's knowingly participating in the conspiracy. The jury was not called upon under the conspiracy count to determine whether Egan personally violated § 12(h) of the Act. The court did not err in refusing the requested instruction.

Some of the government's evidence related to the payment of money after February 25, 1937, to persons holding public office at the time of the receipt of the money. As to such payments the court instructed the jury: "If you find from the evidence that such payments were not, in fact, in connection with the candidacies, nominations, or elections of such persons, they would not be in violation of said section 12 (h). But, on the other hand, if you find from the evidence that such payments were, in fact, made in connection with the candidacies, nominations or elections of such persons, then such payments would be in violation of section 12 (h)."

An exception was taken to this charge by Egan, although no reason for the exception was given. Compare United States v. Turley, supra, 2 Cir., 135 F.2d at page 869. The objection urged in this court is that contributions to officers who are not candidates for office at the time of the payment do not violate the law, and that there is no evidence that any of the recipients of such payments then contemplated being candidates at future elections. We fail to see how this instruction concerns Egan's appeal. The instruction is applicable to the substantive offenses charged in counts 2 to 8 inclusive and not to the conspiracy charge. There was abundant evidence of overt acts under the conspiracy charge of contributions to candidates for various offices, federal and nonfederal, and to political parties and committees. Since Egan was not convicted upon the substantive counts of the indictment, he cannot complain on appeal of the instructions relating to those counts.

Union Electric's requested instructions relate primarily to its corporate responsibility, and its objections to the instructions given bear upon the same point. We have discussed this question in connection with the discussion of the company's motion for a directed verdict of acquittal.

The instructions given by the court covered the issues and were fair to both defendants. There is no merit in the exceptions to the refusals or to the instructions given.

Both judgments appealed from are for the foregoing reasons affirmed.